RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2002 FED App. 0264P (6th Cir.)
File Name: 02a0264p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL RIFLE
ASSOCIATION,
                              *Plaintiff,*

                                                No. 00-2371

OLYMPIC ARMS, a
Washington Corporation, et
al.,
          *Plaintiffs-Appellants,*


          *v.*


BRADLEY A. BUCKLES,
Director, Bureau of Alcohol,
Tobacco and Firearms;
UNITED STATES OF AMERICA,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 95-76357—Robert H. Cleland, District Judge.

Argued: April 23, 2002

Decided and Filed: August 6, 2002

Before:  DAUGHTREY and MOORE, Circuit Judges;
SIMPSON, District Judge.[*]

————————————

**COUNSEL**

**ARGUED:**   James H. Warner, NATIONAL RIFLE ASSOCIATION, Fairfax, Virginia, for Appellants. Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** James H. Warner, NATIONAL RIFLE ASSOCIATION, Fairfax, Virginia, J. Kevin Winters, MICHIGAN UNITED CONSERVATION CLUBS, Lansing, Michigan, for Appellants.  Michael S. Raab, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  Richard A. Rosen, ARNOLD & PORTER, Washington, D.C., for Amicus Curiae.

————————————

**OPINION**

————————————

MARTHA CRAIG DAUGHTREY, Circuit Judge.  This action challenges the constitutionality of Title XI of the Violent Crime Control and Law Enforcement Act of 1994, commonly referred to as the "semi-automatic assault weapons ban." It was originally brought by the National Rifle Association, a group of gun manufacturers and retailers, and a number of individual gun owners. The complaint alleged violations of due process, of equal protection, and of the commerce clause. The district court initially dismissed the action for lack of standing and lack of ripeness. *National Rifle Ass'n v. Magaw*, 909 F.Supp. 490 (E.D. Mich. 1995).  On appeal, we affirmed in part and reversed in part, sustaining

————————————

[*] The Honorable Charles R. Simpson III, United States District Judge for the Western District of Kentucky, sitting by designation.

potentially more dangerous. Additionally, the features are not commonly used on weapons designed solely for hunting. Congress could easily have determined that the greater the number of dangerous add-ons on a semi-automatic weapon, the greater the likelihood that the weapon may be used for dangerous purposes. Further, Congress may work incrementally in protecting public safety. *See, e.g., Semler v. Dental Examiners*, 294 U.S. 608, 610 (1935) (holding that a legislature need not "strike out all evils at one the same time"); *Williamson v. Lee Optical*, 348 U.S. 483, 489 (1955) ("reform may take one step at a time, addressing itself to the phase of the problem which seems most acute in the legislative mind").  Congress's decision first to target weapons commonly used for criminal activity or, likewise, those most heavily loaded with dangerous features is within their legislative authority.  Accordingly, the plaintiffs have failed to meet the heavy burden required to show that the 1994 Act violates equal protection.

### CONCLUSION

For the reasons set out above, we conclude that the semi-automatic assault weapons ban, while perhaps not flawless in its execution, is a legitimate exercise of congressional authority to regulate a significant threat to public health and safety. Because the plaintiffs have failed to demonstrate that the ban violates equal protection, we AFFIRM the judgment of the district court granting summary judgment to the defendants.

dismissal of the individual and organizational plaintiffs,[1] but held that those plaintiffs who were federally licensed firearms manufacturers and dealers had standing to assert the commerce clause and equal protection challenges. On remand, the district court granted summary judgment to the defendants on the remaining claims and dismissed the action.

The plaintiffs now appeal, abandoning the commerce clause challenge but claiming that the Act violates the equal protection component of the Fifth Amendment, on the ground that the statutory definitions are not rationally related to a legitimate governmental interest. The plaintiffs also present, for the first time on appeal, a First Amendment argument that was not fully developed below. We find no reversible error and affirm.

### LEGISLATIVE BACKGROUND

Gun regulation in America has existed throughout the nation's history.[2] In recent times, congressional regulation of interstate commerce in firearms has commonly taken the form of licensing and registration requirements as part of the National Firearms Act of 1934. However, when the National Firearms Act proved ineffective in controlling semi-automatic gun-trafficking, the result was passage in 1968 of the Omnibus Crime Control and Safe Streets Act. The stated purpose of the 1968 legislation was to "strengthen federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4411. In 1989, the Bureau of Alcohol, Tobacco and Firearms banned the importation of assault weapons after finding that they did not meet the "sporting purposes" test of the Gun Control Act of

---

[1] Although the NRA is no longer a party to this action, the remaining plaintiffs continue to be represented by counsel for the Association.

[2] See Michael A. Bellesiles, *Firearms Regulation: A Historical Overview*, 28 CRIME & JUST. 137 (2001).

1968. *See Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989). The ban was designed to lower the number of assault weapons in the United States, given observations by federal authorities that assault weapons were disproportionately used in the commission of violent crimes. In the five years following the import ban, Congress held a series of hearings addressing the continuing threat posed by semi-automatic weapons.[3] *See, e.g.*, H.R. Rep. No. 102-242, pt. 1, at 203 (1991) ("The import ban has proven effective in lowering the number of imported assault weapons linked to crime, It is clear, however, that import restrictions are not enough to deal with the problem. ATF estimates that 75% of assault weapons in the United States are American made.")

As a result of the growing attention to the threat posed by American-made semi-automatic weapons, several bans were proposed both in the House and Senate, all facing fierce opposition by gun rights lobbying groups. In an effort to compromise between the growing concern surrounding semi-automatic weapons and the demands of the gun rights groups, Senator Diane Feinstein proposed a list of common hunting and sporting rifles that would not be subject to the assault-weapon ban. The list, aimed at ensuring that the ban was not used to target recreational firearms, enumerated over 670 weapons. After overcoming several political hurdles, the semi-automatic assault weapons ban was included in the Violent Crime Control and Law Enforcement Act signed into law on September 13,1994, by President Clinton.[4]

---

[3] Hearings were held by committees both in the House and Senate. See 1994 U.S.C.C.A.N. 1820, 1821 & n. 3 (listing House hearings); Assault Weapons: A View From the Front Lines: Hearing on S. 639 and S. 653 Before the Senate Committee on the Judiciary, 103d Cong. (1993). During the hearings, testimony outlining the dangers of semi-automatic weapons was received from a variety of sources: gun experts, law enforcement officials, community activists, medical groups, emergency room doctors, and politicians.

[4] For a more detailed account of the legislative history of the semi-automatic weapon ban challenged in this lawsuit, including the role played by the National Rifle Association in crafting the provisions of the

commonly used in the commission of violent crimes. The "copies or duplicates" language was added to the legislation in order to prevent manufacturers from dodging criminal liability by simply changing the name of the specified weapons.[7] The list of protected weapons was developed based on information provided to congressional representatives that those weapons were commonly used for hunting purposes. Accordingly, it is entirely rational for Congress, in an effort to protect public safety, to choose to ban those weapons commonly used for criminal purposes and to exempt those weapons commonly used for recreational purposes. The fact that many of the protected weapons are somewhat similar in function to those that are banned does not destroy the rationality of the congressional choice. A classification does not fail because it "'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (*quoting Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61 (1911). Further, the ability of the plaintiffs to find experts that may disagree with the congressional findings does not mean that the choices made were irrational. *See, e.g., Vacco v. Quill*, 521 U.S.793, 806 (1997) (holding that New York's assisted suicide law had a rational basis, therefore comporting with equal protection, despite its controversy among medical experts).

The plaintiffs also argue that the ban on semi-automatic weapons with more than one of the enumerated features is irrational because the 1994 Act allows a weapon with one of the features, and the individual features do not work in tandem with each other. This argument is also without merit. Each of the individual enumerated features makes a weapon

---

[7] The plaintiffs argue that a Bureau of Alcohol, Tobacco and Firearms decision to not classify a specific semi-automatic weapon in an individual criminal case in Michigan as a "copy or duplicate" under the meaning of the statute constitutes an official agency determination that the "copy or duplicate" language is "surplusage". *See State v Conyers*, E.D. Mich. #97-80471 (unpublished disposition). An agency's decision not to enforce a provision of a criminal statue in an individual case does not constitute a binding agency determination that the statute lacks rationality or enforceability.

not create an individual right to bear arms).  Accordingly, in order to prevail on their due process claims, the plaintiffs "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. at 111. As explained by the Supreme Court in *Cloverleaf*:

> Although parties challenging legislation under the Equal Protection Clause may introduce evidence supporting their claim that it is irrational, *United States v. Carolene Products Co.*, 304 U.S. 144, 153-54 (1938), they cannot prevail so long as "it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable." *Id.*, at 154. Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken.

*Cloverleaf Creamery*, 499 U.S. at 464. Moreover, the law is entitled to a "strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993).

The allegations of irrationality made by the plaintiffs in this case are two-fold: (1) that several of the weapons on the prohibited list are the functional equivalents of weapons specifically protected under the 1994 Act, and (2) that the statutory criteria outlawing other unlisted semi-automatic weapons serve no legitimate government purpose.

The plaintiffs do not seriously dispute the legitimacy of congressional legislation generally regulating assault weapons, nor do they argue that the weapons protected under the statute could not have been outlawed by Congress. Rather, they argue that variations in the specificity of weapon descriptions and lack of common characteristics in the list of weapons outlawed destroy the constitutional legitimacy of the 1994 Act. This argument is without merit. The list of outlawed weapons was developed by recognizing weapons

Section 110102(a) of the 1994 Act makes it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon." 18 U.S.C. § 922(v)(1). Section 110102(b) defines "semiautomatic assault weapon" with a list of weapons enumerated by name, also outlawing any "copies or duplicates of the firearms" listed. *See* 18 U.S.C. § 921(a)(30)(A). In addition to the enumerated weapons and copies or duplicates thereof, section 110102(b) also classifies semi-automatic rifles and semi-automatic pistols that have the ability to accept a detachable magazine and two of five enumerated accessories, as well as semi-automatic shotguns that have any two of four enumerated features, as "semiautomatic assault weapons" forbidden by the statute.[5] *See* U.S.C. §§ 921 (a) (30)(B)-(D).

In enacting the law, Congress provided several protective measures for gun owners. First, Section 110102(a) of the 1994 Act contains a grandfather clause that exempts semi-automatic weapons lawfully possessed at the date of enactment from its provisions. *See* 18 U.S.C. § 922(v)(2). Additionally, the statute does not apply to a list of enumerated firearms, as well as replicas or duplicates of those firearms. *See id.* § 922(v)(3); *id*. App. A.

### ANALYSIS

The plaintiffs allege that this legislative scheme is unconstitutional both because it irrationally classifies

---

ban, see Micheal G. Lennett, *Taking a Bite out of Violent Crime*, 20 U. DAYTON L. REV. 573 (1995)

[5] The enumerated features outlined in the legislation include:
(i) a folding or telescoping stock;
(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
(iii) a bayonet mount;
(iv) a flash suppressor or threaded barrel design to accommodate a flash suppresser; and
(v) a grenade launcher.
*See Id.*

weapons in violation of equal protection and because it violates the First Amendment by regulating "emotive speech."

The latter question need not long detain us long. The First Amendment claim was not included in the complaint or in the amended complaint filed in this action. Indeed, the plaintiffs' only mention of a free speech argument was made in passing in their brief in opposition to the defendants' motion for summary judgment. For this reason, the district court declined to rule on the issue, characterizing it as "underdeveloped." As a general rule, we would likewise decline to review the issue, there being no decision to sustain or reject on appeal. *See, e.g.*, *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 243-44 (6th Cir. 1991). We have taken exception to this general rule, however, "where the errors or omissions are obvious, unfair or undermine the integrity or public confidence of judicial proceedings." *Brown v. Crowe*, 963 F.2d 895 (6th Cir. 1992). That cannot be said to be the case here, especially in view of the fact that the "prior restraint" cases cited in the plaintiffs' appellate briefs simply are not applicable to the facts of this case. Hence, even if the issue had been squarely presented, we could not find in the plaintiffs' favor based on the authority submitted on appeal.

There remains the equal protection question, which is raised here under the Fifth Amendment's Due Process Clause. The district court held that the claim was non-cognizable because the Equal Protection Clause protects against inappropriate classifications of people, rather than things. This position has been adopted by several courts. *See, e.g.*, *Benjamin v Bailey*, 622 A.2d 1226 (Conn. 1995)(holding that a state weapons ban did not violate equal protection principles because "the plaintiffs' challenge relat[ed] to classifications among weapons, not persons"); *California Rifle & Pistol Ass'n v. City of West Hollywood*, 66 Cal. App. 4th 1302 (1998). Other courts have held that because persons have interest in things, classifications of these things can be challenged on equal protection grounds. *See e.g.*, *Kasler v. Lockyer*, 23 Cal. 4th 472, 479 (2000). In *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1980), the United States

Supreme Court engaged in an equal protection analysis in reviewing state legislation that distinguished between plastic and paperboard milk containers without discussing whether the classification applied to the containers themselves or to the manufacturers.[6]  However, because the plaintiff's challenge in this case does not allege that the semi-automatic weapons ban will prohibit completely the production of weapons by any individual gun manufacturer, *Clover Leaf* would not seem to provide clear guidance here.

We conclude, however, that by honoring the basic canon of avoiding constitutional questions where possible, we need not decide the scope of equal protection in order resolve the issue presented in this case. *See, e.g.*, *United States v. Security Industry Bank*, 459 U. S. 70,78 (1982) (in cases of statutory interpretation, courts should avoid addressing constitutional the resolution of which is unnecessary to the case). For even if we were to assume that equal protection analysis is appropriate here, we would have to conclude that the semi-automatic assault weapons ban meets all equal protection requirements.

If legislation neither burdens a fundamental constitutional right nor targets a suspect classification, it will withstand constitutional scrutiny so long as it bears a rational relationship to a legitimate government interest. *Romer v. Evans*, 517 U.S. 620, 031 (1996). Sixth Circuit precedent does not recognize a fundamental right to individual weapon ownership or manufacture, and the plaintiffs, gun retailers and owners, are not a suspect class. *See United States v. Napier*, 233 F.3d 394, 402 (6th Cir. 2000) (Second Amendment does

---

[6]Many scholars believe that the challenge in *Cloverleaf* was cognizable because distinguishing between the two types of milk cartons was effectively distinguishing between in-state and out-of-state milk producers. Even though the Court did not find that the provision amounted to economic protectionism, regulation of the right to engage in a livelihood based on state citizenship clearly raises a more traditional question of equal protection than does the regulation now before us. *See, e.g.*, Robert C. Ferrell, *Legislative Purpose and Equal Protection's Rationality Review*, 37 VILL. L. REV. 1 (1992).