# ILLINOIS OFFICIAL REPORTS

## Supreme Court

***Wilson v. County of Cook*, 2012 IL 112026**

| | |
|---|---|
| Caption in Supreme Court: | MATTHEW D. WILSON *et al.*, Appellants, v. THE COUNTY OF COOK *et al.*, Appellees. |
| Docket No. | 112026 |
| Filed | April 5, 2012 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A facial second amendment challenge to an assault weapons ban should not have been dismissed at the pleading stage where there were empirical questions, beyond the scope of the record and judicial notice, as to whether assault weapons, as defined, were within or beyond the amendment's protection. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Mary K. Rochford, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part.<br>Cause remanded. |

Counsel on
Appeal

Victor D. Quilici, of River Grove, Edward Ronkowski, of Mokena, and Stephen P. Halbrook, of Fairfax, Virginia, for appellants.

Anita Alvarez, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., Paul A. Castiglione and Marilyn Fusco Schlesinger, Assistant State's Attorneys, of counsel), for appellees.

William N. Howard and Garry L. Wills, of Freeborn & Peters, of Chicago, for *amicus curiae* Certain Illinois Legislators.

Charles Wm. Dobra, of Roselle, and Joseph M. Hickson III, of the Hickson Law Group, P.C., of Springfield, Massachusetts, for *amicus curiae* Commonwealth Second Amendment, Inc.

James R. Thompson, Matthew R. Carter and Rebecca S. Bradley, of Winston & Strawn LLP, of Chicago, for *amicus curiae* The Illinois Firearms Manufacturers Association.

Stephen A. Kolodziej, of Brenner, Ford, Monroe & Scott, Ltd., of Chicago, and Charles J. Cooper, David H. Thompson and Peter A. Patterson, of Cooper & Kirk, PLLC, of Washington, D.C., for *amicus curiae* The National Rifle Association of America, Inc.

James B. Vogts, of Swanson, Martin & Bell, LLP, of Chicago, for *amicus curiae* National Shooting Sports Foundation, Inc.

Benjamin Blustein and Nancy L. Maldonado, of Miner, Barnhill & Galland, PC, of Chicago, and Paul R.Q. Wolfson, Joshua M. Salzman, Laura Moranchek Hussain and Francesco Valentini, of Wilmer Cutler Pickering Hale & Dorr, LLP, and Jonathan E. Lowy and Daniel R. Vice, all of Washington, D.C., for *amicus curiae* Brady Center To Prevent Gun Violence.

Jonathan K. Baum, Jonathan S. Feld, Bonita L. Stone, Sharyn M. Castle and Jessica R. Price, of Katten Muchin Rosenman LLP, of Chicago, for *amici curiae* Legal Community Against Violence *et al.*

Justices        JUSTICE THEIS delivered the judgment of the court, with opinion.
Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion.


**OPINION**

¶ 1    This appeal involves a challenge to the constitutionality of the Blair Holt Assault Weapons Ban (Cook County Ordinance No. 06-O-50 (approved Nov. 14, 2006)) (Ordinance). Plaintiffs, Matthew D. Wilson, Troy Edhlund, and Joseph Messineo, sought a declaration, *inter alia,* that the Ordinance violates the due process and equal protection clauses of the United States Constitution and violates the second amendment right to bear arms. The circuit court of Cook County dismissed the first amended complaint, pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2006)), finding that plaintiffs failed to state a cause of action that the Ordinance unconstitutionally infringed on the right to bear arms or violated principles of due process or equal protection. The appellate court upheld the dismissal. 407 Ill. App. 3d 759. For the following reasons, we affirm in part and reverse in part the judgment of the appellate court, and remand the cause to the trial court for further proceedings.


¶ 2                        BACKGROUND

¶ 3                   History of the Ordinance

¶ 4    For nearly two decades, Cook County has had various ordinances in place banning the possession of assault weapons. Beginning in 1993, based upon a finding of public health and welfare concerns caused by both assault weapons and firearms in general, the Cook County board of commissioners enacted the Cook County Firearms Dealer's License and Assault Weapons and Ammunition Ban Ordinance (Cook County Ordinance No. 93-O-37 (approved Jan. 1, 1994)). The law prohibited the sale, transfer, acquisition, ownership, or possession of "assault weapons," defined by a specific list of 60 rifles and pistols designated by model name or type, and "assault ammunition," including any ammunition magazine having a capacity of more than 12 rounds of ammunition. The commissioners specifically noted in the prefatory clause of the ordinance that: (1) easy access to firearms and ammunition had become a concern of public health, safety and welfare for the citizens of Cook County; (2) assault weapons were 20 times more likely to be used in the commission of a crime than other kinds of weapons; and (3) there was "no legitimate sporting purpose for the military style assault weapons being used on the streets."[1]

---

[1]Prior to its effective date, the Ordinance was amended to remove the prohibitions relating to assault ammunition. Cook County Ordinance No. 93-O-46 (approved Nov. 16, 1993). The

-3-

¶ 5        Shortly thereafter, in 1994, after a series of hearings on the subject of semiautomatic assault weapons over a five-year period,[2] Congress enacted the Violent Crime Control and Law Enforcement Act, Pub. L. 103-322, 108 Stat. 1796 (codified at 18 U.S.C. §§ 921, 922 (1994)), including a ban on the possession of "semiautomatic assault weapons" and "large capacity ammunition feeding devices" not lawfully possessed as of the date of the enactment. 18 U.S.C. §§ 921(a)(30), (a)(31), 922(v), (w) (1994). The law defined a "semiautomatic assault weapon" in several different ways, including a specific list of banned firearms or "copies or duplicates" of those firearms. In addition to banning weapons by name, the law banned other semiautomatic rifles, pistols and shotguns that possessed two or more specific characteristics that the legislature found were designed for military applications and that distinguished the firearms from traditional sporting weapons or those useful for self-defense. 18 U.S.C. § 921(a)(30)(A)-(D) (1994). Congress found these features were combat-designed features that enabled shooters to discharge high numbers of bullets rapidly in a "spray fire" fashion while maintaining control of the firearm, creating enhanced lethality. H.R. Rep. No. 103-489, at 18-20 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1820, 1826-27. The law also specifically exempted a list of 661 firearms by make and model that the legislature found were most commonly used in hunting and recreational sports. 18 U.S.C. § 921, app. A (1994). The Act was written to expire 10 years after its enactment, and due to a lack of further congressional action, the law expired in 2004.

¶ 6        Thereafter, in 2006, the County sought to fill the void left by the expiration of the federal assault weapons ban by amending the 1993 ordinance. Currently, the ordinance expands the definition of assault weapon by imposing a characteristic-based test similar to the federal ban and by including a nonexhaustive list of various prohibited models and copies or duplicates thereof. Cook County Ordinance No. 06-O-50 (approved Nov. 14, 2006). The Ordinance also prohibits the possession of large capacity magazines with the capacity to accept more than 10 rounds of ammunition. *Id*. Under its provisions, a person who prior to the enactment lawfully possessed assault weapons or large capacity magazines had 90 days from the effective date to surrender the weapons to the sheriff, to remove the weapons from the county, or to modify the weapons to render them inoperable or no longer defined as an assault weapon. *Id*. Violation of the Ordinance is punishable by imprisonment for not more than six months and by a fine between $500 and $1,000. *Id*. In 2007, the Ordinance was renamed the Blair Holt Assault Weapons Ban. Cook County Ordinance No. 07-O-36 (approved June 19, 2007).

_____

Ordinance was amended again in 1999 to modify sections not at issue in this appeal and was renamed the Cook County Deadly Weapons Control Ordinance. Cook County Ordinance No. 99-O-27 (approved Nov. 23, 1999).

        [2]See H.R. Rep. No. 103-489, at 12-20 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1820, 1820-28.

¶ 7                                    Procedural History

¶ 8          In September 2007, plaintiffs filed a preenforcement action seeking declaratory and
injunctive relief against the County, the individual commissioners of the Cook County board
of commissioners, and Cook County Sheriff Tom Dart, and challenging, *inter alia*, the
constitutionality of the Ordinance. In their first amended complaint, plaintiffs allege that they
are "law abiding citizens" and residents of Cook County who have properly issued firearm
owner's identification cards. They allege that they own various firearms, magazines, and gun
parts which were legally purchased for self-defense in the home, for recreational purposes,
or as part of firearm collections.

¶ 9          Of relevance to the arguments raised in this appeal, plaintiffs allege in count I that the
Ordinance violates the due process clause of the United States Constitution because the
definition of assault weapons is unconstitutionally vague. Plaintiffs allege that they are of
ordinary intelligence, and that based upon the vague definitions of assault weapons in the
Ordinance they must guess whether their firearms fall within the purview of the Ordinance,
subjecting them to the risk of imprisonment and fines. In addition, plaintiffs allege that they
seek to legally purchase additional firearms, parts, and accessories, but cannot because
plaintiffs are uncertain whether they may be prohibited under the Ordinance. Plaintiffs also
indicate that the 90-day time period in which to conform with the Ordinance has passed. In
count IV, plaintiffs allege a violation of the individual right to bear arms as guaranteed under
the second amendment to the United States Constitution. In count VI, plaintiffs allege a
violation of the equal protection clause of the United States Constitution because the
Ordinance arbitrarily classifies certain firearms. Plaintiffs attached various photographs of
certain firearms to support their allegations.[3] Thereafter, the circuit court granted the
County's motion to dismiss with prejudice the first amended complaint pursuant to section
2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2006)), holding that the
claims failed as a matter of law. The court found that: (1) the Ordinance was not
unconstitutionally vague; (2) the Ordinance did not violate the second amendment because
it constrained only infringement by the federal government and had never been incorporated
into the fourteenth amendment; and (3) plaintiffs failed to state a cause of action for a
violation of the equal protection clause.

¶ 10         The appellate court affirmed, ruling that the Supreme Court's holding in *District of
Columbia v. Heller*, 554 U.S. 570 (2008), did not provide a fundamental right to bear arms
applicable to the states and, therefore, the right to bear arms was subject to the police power
of the state. *Wilson v. Cook County*, 394 Ill. App. 3d 534, 542-44 (2009). The appellate court
additionally found that the circuit court properly denied plaintiffs' vagueness and equal
protection challenges. *Id.* at 544-46.

¶ 11         Plaintiffs subsequently filed a petition for leave to appeal in this court. While the petition

_____

[3]Counts II, III, and V, which are not raised in this appeal, involved allegations that the
Ordinance violated due process because it imposed strict liability, was overbroad in its application,
and was an unconstitutional exercise of the police power.

was pending, the United States Supreme Court filed its decision in *McDonald v. City of Chicago*, 561 U.S. ___, 130 S. Ct. 3020 (2010). The Supreme Court held for the first time that the second amendment applies to the states through the due process clause of the fourteenth amendment. *Id*. at ___, 130 S. Ct. at 3050. We entered a supervisory order directing the appellate court to vacate its prior judgment and to reconsider the appeal in light of *McDonald*. *Wilson v. Cook County*, 237 Ill. 2d 593 (2010) (supervisory order). On remand, the appellate court again affirmed the circuit court's dismissal of the complaint. *Wilson v. Cook County*, 407 Ill. App. 3d 759 (2011). Therein, the court held, *inter alia*, that the second amendment right does not extend to assault weapons and that the Ordinance is substantially related to an important governmental interest. *Wilson*, 407 Ill. App. 3d at 773-74. Specifically, relying on the decisions in *People v. James*, 94 Cal. Rptr. 3d 576 (Cal. Ct. App. 2009), and *Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010), *vacated in part*, No. 10-7036, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011), the court found the restrictions of the Ordinance are supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons and allow for the continued protected use of common firearms. *Wilson*, 407 Ill. App. 3d at 773-74. The court further held that the definitions in the Ordinance are not vague, but have their plain and ordinary meanings, and that plaintiffs failed to allege any facts that would support an equal protection claim. *Id*. at 774-75.

¶ 12    We subsequently granted plaintiffs' petition for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)). We allowed the Commonwealth Second Amendment, the Illinois Conservation Police Lodge, certain Illinois legislators, the Illinois Firearms Manufacturers Association, the National Shooting Sports Foundation, and the National Rifle Association of America, Inc., to submit *amicus curiae* briefs in support of plaintiffs. We additionally allowed the Brady Center to Prevent Gun Violence, the Legal Community Against Gun Violence, the City of Chicago, the Major Cities Chiefs Association, and the Association of Prosecuting Attorneys to submit *amicus curiae* briefs in support of the County.

¶ 13                                    ANALYSIS

¶ 14    This appeal comes before the court on the circuit court's grant of a motion to dismiss pursuant to section 2-615 of the Code. A motion to dismiss under section 2-615 challenges the legal sufficiency of the complaint based on defects on the face of the complaint. *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 61. "The critical inquiry in deciding a section 2-615 motion to dismiss is whether the allegations in the complaint, considered in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted." *Id*. A cause of action will be dismissed on the pleadings only if it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Id*. In ruling on such a motion, only those facts apparent from the face of the pleadings, matters of which the court can take judicial notice, and judicial admissions in the record may be considered. *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009). We review *de novo* an order granting a section 2-615 motion to dismiss. *Id*. We also note that the

ultimate question of whether an ordinance is unconstitutional is a question of law, which this court also reviews *de novo. People v. Madrigal*, 241 Ill. 2d 463, 466 (2011).

¶ 15                                    The Ordinance

¶ 16        We begin with an overview of the Ordinance. Section 54-212 of the Cook County Code provides that "No person shall manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess any assault weapon or large capacity magazine." Cook County Code § 54-212 (amended by Cook County Ordinance No. 06-O-50 (approved Nov. 14, 2006)). Section 54-211 specifically defines assault weapon by the following characteristics:

> "(1) A semiautomatic rifle that has the capacity to accept a large capacity magazine[,] detachable or otherwise[,] and one or more of the following:

>> (A) Only a pistol grip without a stock attached;

>> (B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

>> (C) A folding, telescoping or thumbhole stock;

>> (D) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or

>> (E) A muzzle brake or muzzle compensator;

> (2) A semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than 10 rounds of ammunition;

> (3) A semiautomatic pistol that has the capacity to accept a detachable magazine and has one or more of the following:

>> (A) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

>> (B) A folding, telescoping or thumbhole stock;

>> (C) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel;

>> (D) A muzzle brake or muzzle compensator; or

>> (E) The capacity to accept a detachable magazine at some location outside of the pistol grip.

> (4) A semiautomatic shotgun that has one or more of the following:

(A) Only a pistol grip without a stock attached;

(B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;

(C) A folding, telescoping or thumbhole stock;

(D) A fixed magazine capacity in excess of 5 rounds; or

(E) An ability to accept a detachable magazine;

(5) Any shotgun with a revolving cylinder.

(6) Conversion kit, part or combination of parts, from which an assault weapon can be assembled if those parts are in the possession or under the control of the same person[.]" *Id*. § 54-211 (amended Nov. 14, 2006).

¶ 17    The Ordinance specifically excludes "any firearm that has been made permanently inoperable, *** 'antique firearm[s],' *** or weapons designed for Olympic target shooting events." *Id*.

¶ 18    In addition, under section 54-211 the following additional terms are specifically defined:

"(c) *Detachable magazine* means any ammunition feeding device, the function of which is to deliver one or more ammunition cartridges into the firing chamber, which can be removed from the firearm without the use of any tool, including a bullet or ammunition cartridge.

(d) *Large capacity magazine* means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include the following:

(1) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

(2) A 22 [*sic*] caliber tube ammunition feeding device.

(3) A tubular magazine that is contained in a lever-action firearm.

(e) '*Muzzle brake*' means a device attached to the muzzle of a weapon that utilizes escaping gas to reduce recoil.

(f) '*Muzzle compensator*' means a device attached to the muzzle of a weapon that utilizes escaping gas to control muzzle movement." (Emphases in original.) *Id.*

¶ 19                                  Vagueness Challenge

¶ 20    In this preenforcement facial challenge, plaintiffs have alleged that the Ordinance is vague and therefore violates the due process clause of the United States Constitution (U.S. Const., amend. XIV). Plaintiffs contend that the Ordinance defines assault weapons by "an

arbitrary and ill-defined subset of these weapons without providing any explanation for its selections, and the language employed to describe various features or components of firearms that make them 'assault [w]eapons' is both vague and arbitrary."

¶ 21   The notion that an Ordinance is void for vagueness is a concept derived from the notice requirement of the due process clause. The concern animating the doctrine is twofold: (1) whether the law fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits so that one may act accordingly; and (2) whether the law provides reasonable standards to law enforcement to ensure against authorizing or even encouraging arbitrary and discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

¶ 22   Additionally, in determining the clarity that the Constitution demands of a law, we are cognizant that in the context of first amendment freedoms the Supreme Court has expressed that "[u]ncertain meanings inevitably lead citizens to steer far wider of the unlawful zone ... than [they would] if the boundaries of the forbidden areas were clearly marked." (Internal quotation marks omitted.) *Grayned*, 408 U.S. at 109. Thus, in cases where the law threatens to inhibit a first amendment right it has been said that the Constitution requires a "greater degree of specificity." *Smith v. Goguen*, 415 U.S. 566, 574 (1974). However, " 'perfect clarity and precise guidance have never been required.' " *United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

¶ 23   We are also mindful that, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). The Constitution tolerates a lesser degree of vagueness in enactments with criminal rather than civil penalties and specifically those without a *scienter* requirement because the consequences of imprecision are more severe. *Id*. at 499. In order to succeed in a facial vagueness challenge, as opposed to an as-applied challenge, the vagueness must "permeate[ ] the text of such a law." *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999).

¶ 24   In construing the validity of the ordinance, we begin by applying the same rules that govern the construction of a statute. *Pooh-Bah Enterprises, Inc.*, 232 Ill. 2d at 492. Thus, as with a statute, the first step in a vagueness inquiry is to examine the plain language of the ordinance in light of its common understanding and practice. *Id*. If the plain text of the ordinance sets forth clearly perceived boundaries, our inquiry is ended. *Id.*

¶ 25   With these principles in mind, we address plaintiffs' contentions. At the outset, we note that plaintiffs provide little or no argument in their brief to support their vagueness challenge, but instead merely direct our attention to specific paragraphs in the first amended complaint and attached exhibits. Accordingly, we look exclusively to those allegations highlighted by plaintiffs in their brief, and to the extent that they have failed to address other allegations raised in the complaint, those arguments have been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 n.2 (2006).

¶ 26    Plaintiffs initially challenge as vague the definition of an "assault weapon" in section 54-211(1) as a "semiautomatic rifle that has the capacity to accept a large capacity magazine[,] detachable or otherwise." Plaintiffs allege that the language "has the capacity to accept" does not put an individual on notice whether a particular semiautomatic rifle with a detachable magazine is prohibited. Plaintiffs posit as an example an individual who possesses a firearm which, when purchased, was not manufactured to accept a large-capacity magazine but, subsequently, can accommodate the large-capacity magazine through a modification available in the marketplace. Plaintiffs maintain that under this example, the Ordinance violates due process because an ordinary intelligent gun owner may not know of such availability, but would be subject to prosecution.

¶ 27    In support, plaintiffs rely on the Sixth Circuit decision in *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 535-36 (6th Cir. 1998). There, an ordinance defined "assault weapon" as "any semiautomatic action, center fire rifle or carbine that accepts a detachable magazine with a capacity of 20 rounds or more." *Id*. at 535. The plaintiffs challenged the provision on vagueness grounds. The record indicated that any semiautomatic rifle that accepts a detachable magazine would accept a detachable magazine of any capacity that might exist. The court held this provision was "little more than a trap for the unwary." *Id*. The court reasoned that since the ordinance contained no *scienter* requirement, the lack of knowledge as to the high-capacity magazine's existence was of no consequence in prosecuting the offense. *Id.* at 536. Since the capacity was limited only by the availability of a large-capacity magazine, and not by actual possession, all owners with semiautomatic, center-fire rifles and carbines with detachable magazines were in jeopardy of prosecution if a compatible large-capacity magazine was discovered or had ever been manufactured. The court held that "[d]ue process demands more than this" and that "presumably" this construction of the ordinance was not intended by the Columbus city council. *Id.*

¶ 28    Nevertheless, based on the plain language of this Ordinance, and the allegations in the first amended complaint, we find the Ordinance is not vague and is distinguishable from the Sixth Circuit decision. "Capacity," as defined by its ordinary meaning, includes "the power or ability to hold, receive, or accommodate." Webster's Third New International Dictionary 330 (1993). It is evident from plaintiffs' own allegations that the language in section 54-211(1) means that any semiautomatic rifle with the ability to accommodate a large-capacity magazine and which also has one of the five listed features is prohibited, whether the large-capacity magazine which it accommodates is currently manufactured or may be in the future. The absence of a *scienter* requirement does not alter our conclusion that the Ordinance is not unconstitutionally vague on its face. As evinced by plaintiffs' allegations, any semiautomatic rifle with the capacity to accept a 10-round magazine is also capable of accepting a large-capacity magazine. Thus, since plaintiffs acknowledge that all semiautomatic rifles that accept a magazine are capable of accommodating the larger capacity, it follows that the conduct proscribed is knowable and the prohibition is clear. Therefore, albeit broad, the language "has the capacity to accept" is not facially vague. Its prohibitions are clearly defined, as plaintiffs' own allegations demonstrate.

¶ 29    Additionally, unlike the Columbus ordinance in *Peoples Rights Organization*, the County

chose to add an additional characteristic test similar to the federal ban on assault weapons. Under the Ordinance, the weapon must not only have the capacity to accept a large-capacity magazine, but must also have one of five other enumerated characteristics. Cook County Code § 54-211(1)(A) to (E) (definition of assault weapon). The five additional enumerated properties are different in kind from the capacity requirement because these properties refer to extant properties of the weapon and not "potential properties" or "capabilities." Thus, an individual that seeks to possess a semiautomatic rifle with the capacity to accept a large-capacity magazine but which has none of the other additional features is on notice that his weapon is not prohibited. Accordingly, we cannot say that vagueness permeates the text of section 54-211(1).

¶ 30    Plaintiffs further allege that several of the specific enumerated characteristics such as "barrel shroud" or "protruding grip" are vague generic features that would potentially qualify any weapon as an assault weapon. Courts that have analyzed similar language have declared these attributes to be specific and readily discernible characteristics. See *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685 (2d Cir. 1996). We note that lower federal court decisions are not binding on Illinois courts, but may be considered persuasive authority. *People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 127 (2001). As the court explained in *Richmond Boro Gun Club*, an ordinance is not facially vague merely because "a host of items exist that, although not specifically intended to serve these purposes, could arguably do so, thereby subjecting an unsuspecting gun owner to criminal liability." *Richmond Boro Gun Club*, 97 F.3d at 685. The court stated that this argument is self-defeating because "the issue is not whether plaintiffs can posit some application not clearly defined by the legislation." *Id*. The issue is whether the vagueness "permeates the text." *Morales*, 527 U.S. at 55. We agree with the trial and appellate courts that based on their plain language these terms are not so ill-defined that they are facially vague.

¶ 31    Plaintiffs additionally allege that the use of the phrase "copies or duplicates" in section 54-211(7) is vague because the weapons may have similar functions, but have different cosmetic components. Section 54-211(7) provides a nonexhaustive list of weapons which are prohibited as well as "copies or duplicates thereof." A "copy" is defined as "an imitation, *** or reproduction of an original work." Webster's Third New International Dictionary 504 (1993). A "duplicate" is defined to include "either of two things that exactly resemble or correspond to each other" (Webster's Third New International Dictionary 702 (1993)). The "copies or duplicates" language was added to the Ordinance in order to prevent manufacturers from simply changing the name of the specified weapons to avoid criminal liability. See *Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002); see also *In re R.C.*, 195 Ill. 2d 291, 299 (2001) (noting that when considering a vagueness challenge a court considers not only the language, but the legislative objective and the evil it is designed to remedy).

¶ 32    A person of ordinary intelligence would understand that section 54-211(7) includes the specific weapons listed and any imitations or reproductions of those weapons made by that manufacturer or another. When read together with the listed weapons, the provision is not vague. In addition, plaintiffs' argument ignores the rule of statutory construction that we must construe the Ordinance as a whole. *People v. Marshall*, 242 Ill. 2d 285, 292 (2011).

When the Ordinance is read as a whole, reference to section 54-211(1) through (6) would also put an individual on notice whether a particular weapon is banned based on the specific characteristics of the weapon.

¶ 33    The "copies or duplicates" language together with the characteristics-based test serve to rectify the problems outlined in *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994), a case relied on by plaintiffs in support of their argument. There, the court sustained a vagueness challenge to an ordinance which banned assault weapons only by outlawing certain brand names without including within the prohibition similar weapons of the same type, function or capability. In that case the consumer was "without a reasoned basis for determining which firearms are prohibited." *Id*. at 252. In contrast, the Ordinance provides standards and a reasoned basis on which to determine whether a firearm is banned. Accordingly, for the foregoing reasons, the trial court properly dismissed count I of plaintiffs' first amended complaint.

¶ 34                            Second Amendment Challenge

¶ 35    Plaintiffs contend that the County's ban on assault weapons as defined in the Ordinance violates the second amendment right to bear arms. The second amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In its 2008 decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), a five justice majority of the Supreme Court expressly recognized, in its first "in-depth examination," that the second amendment confers an individual right to keep and bear arms *(id*. at 592), and that the "central component of the right" is the right of armed self-defense, most notably in the home. (Emphasis omitted.) *Id*. at 595, 599-600.

¶ 36    Based on this interpretation, the Court invalidated the District of Columbia's complete prohibition on handguns in the home by law-abiding citizens, and invalidated its requirement that all firearms in the home be kept inoperable. *Id*. at 629-35. The majority found that "under any of the standards of scrutiny the Court has applied to enumerated constitutional rights" a prohibition on all handguns was a ban on "an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose" of self-defense and that a complete prohibition on their use was invalid. *Id.* at 628. The Court explained that "whatever else [the second amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635.

¶ 37    Nevertheless, the Court held that the scope of the right is not without limitations. The Court made clear that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626. An individual does not have "a right to keep and carry *any* weapon whatsoever in *any* manner whatsoever and for whatever purpose." (Emphases added.) *Id*. Notably, the majority of the Court interpreted its prior decision in *United States v. Miller*, 307 U.S. 174 (1939), to stand for the proposition that the second amendment right extends

-12-

only to certain types of weapons. *Id*. at 623. The Court read *Miller* to say that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 625. The Court found support for this "important limitation" in "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id*. at 627.

¶ 38    The Court additionally attempted to sketch out a nonexhaustive list of "presumptively lawful regulatory measures," including "longstanding [*sic*] prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-27. The Court declined to explain what it meant by "long-standing" or elaborate on the historical justifications for these exceptions. See *id*. It found it unnecessary to define the outer limits of the right or identify the level of scrutiny that should be applied to laws that burden those rights because the District of Columbia law under consideration would violate the second amendment "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id*. at 628.

¶ 39    Thereafter, the Supreme Court revisited the second amendment in *McDonald v. City of Chicago*, 561 U.S. ___, 130 S. Ct. 3020 (2010). A plurality of the Court held that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id*. at ___, 130 S. Ct. at 3050. The Supreme Court reiterated its central holding in *Heller* "that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *Id.* Additionally, the Court reiterated that the second amendment right was far from absolute and noted that the doctrine of incorporation "does not imperil every law regulating firearms." *Id*. at ___, 130 S. Ct. at 3047.

¶ 40    Since *Heller* and *McDonald*, courts have begun to develop a general framework for analyzing the newly enunciated second amendment right. These courts have endeavored to (1) outline the appropriate scope of the individual second amendment guarantee as defined in *Heller*; and (2) determine the appropriate standard of scrutiny for laws that burden these rights. See, *e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011); *Heller v. District of Columbia*, No. 10-7036, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011) (*Heller II*).

¶ 41    These courts have generally followed a two-pronged approach. The threshold question we must consider is whether the challenged law imposes a burden on conduct falling within the scope of the second amendment guarantee. That inquiry involves a textual and historical inquiry to determine whether the conduct was understood to be within the scope of the right at the time of ratification. *Heller*, 554 U.S. at 634-35; *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3047. If the government can establish that the challenged law regulates activity falling outside the scope of the second amendment right, then the regulated activity is categorically unprotected. *Ezell*, 651 F.3d at 702-03.

¶ 42    However, "if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected—then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment

-13-

rights." *Id*. at 703. What form that takes has been articulated in various ways, but courts generally recognize that *Heller* rejected rational-basis review and requires some form of heightened scrutiny. See, *e.g.*, *Ezell*, 651 F.3d at 702-04; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010); *Heller II*, 2011 WL 4551558, at *5.

¶ 43                  Plaintiffs' Pleadings and the Scope of the Second Amendment

¶ 44       As *Heller* explained, the second amendment does not provide a right to possess any weapon whatsoever and clearly articulates that certain types of weapons are not eligible for second amendment protection. The second amendment categorically protects the right of law-abiding citizens to possess a handgun, particularly for self-defense in the home, because handguns are a class of arms that the Supreme Court has found are "overwhelmingly" chosen by American society for the lawful purpose of self-defense. Unlike the District of Columbia handgun ban, we cannot say as a matter of law that the Ordinance purports to prohibit an entire class of arms that is overwhelmingly chosen by American society for self-defense in the home. The Ordinance is not an absolute ban on the possession of all rifles, shotguns, or pistols for self-defense. Nor is it a complete ban on all semiautomatic firearms. Instead, it covers a particular subset of these weapons with particular characteristics that the County has determined make them capable of firing rapidly, delivering a large number of shots without reloading, and creating a high risk of collateral damage. The Court in *Heller* had no reason to consider regulation of these particular types of firearms with these particular attributes.

¶ 45       Nor can it be said with any certainty, unlike in *Heller*, that assault weapons, as defined under the Ordinance, are the "quintessential weapon of choice" for self-defense by Americans. At least some of these types of weapons were banned for 10 years under federal law and have been banned in some degree by numerous states and municipalities, albeit without any uniform definition. See, *e.g.*, Mass. Gen. Laws ch. 140, §§ 121, 131M (2008); N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5(f), 2C:58-12 (West 2008); N.Y. Penal Law §§ 265.00(21), (22), 265.10, 265.20(a)(16) (McKinney 2008); Haw. Rev. Stat. §§ 134-1, 134-4(e) (2007); Aurora (Ill.) Code of Ordinances § 29-49 (2008); Chicago Municipal Code §§ 8-20-030(h), 8-20-40, 8-20-50 (2008); Columbus City (Ohio) City Codes §§ 2323.11(G), 2323.31 (2008). In 1994, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives characterized assault weapons as "mass produced mayhem" and weapons of choice for gangs, drug dealers, and mass killers to outgun police officers on the streets. ATF, *Assault Weapons Profile* 19 (1994). The ATF, Congress, and the County have concluded that assault weapons under varied definitions have no "sporting purpose."

¶ 46       With that said, neither can we say conclusively at this early stage of the litigation that assault weapons as defined in this Ordinance categorically fall outside the scope of the rights protected by the second amendment. *Heller* explicitly recognized a historical and long-standing tradition of firearms regulations prohibiting a category of "dangerous and unusual weapons" that are "not typically possessed by law-abiding citizens for lawful purposes." Historically, weapons like machine guns, sawed-off shotguns, grenade launchers, and other

high-powered weapons have fallen into this category due to their extreme nature. See, *e.g.*, *United States v. McCartney*, 357 F. App'x 73 (9th Cir. 2009) (finding that machine gun possessed by defendant was dangerous and unusual; noting that defendant's own expert testified that possession by private citizen was unusual); *United States v. Fincher*, 538 F.3d 868, 870, 873-74 (8th Cir. 2008) (machine gun and sawed-off shotgun not protected by the second amendment because they were not in common use by law-abiding citizens for lawful purposes); *United States v. Dempsey*, 957 F.2d 831, 834 (11th Cir. 1992) (court reasoned that unlike firearms which may be used for sport, recreation or collection, pipe bombs had no legitimate purpose); *State v. Fennell*, 382 S.E.2d 231, 233 (N.C. Ct. App. 1989) (noting the danger posed by a sawed-off shotgun because it may be readily concealed and because of its wide and nearly indiscriminate spraying of its shot).

¶ 47    Excluding these types of arms has been analogized to excluding fighting words from the ambit of first amendment protection because:

> "the value provided by the fighting words/machine gun is so slight that it will always be outweighed by 'the social interest in order and morality.' In other words, the interest that one would have in possessing a machine gun—for example, the ability to repel home invasions or attack by mobs—can never justify the increased potential of collateral damage resulting from the use of such a weapon." Jason T. Anderson, Note, *Second Amendment Standards of Review: What the Supreme Court Left Unanswered in District of Columbia v. Heller*, 82 S. Cal. L. Rev. 547, 578-79 (2009).

> Others have suggested that *Heller*'s adaption of *Miller*'s criterion suggests the Court "wishes to distinguish a limited class of arms that is only appropriate for use on military battlefields, where the social compact is completely suspended, from the broader class of arms that are amenable to being commonly kept within civil society." Michael P. O'Shea, *The Right to Defensive Arms After District of Columbia v. Heller*, 111 W. Va. L. Rev. 349, 385 (2009).

¶ 48    The parties vigorously debate the dangers of assault weapons as defined by the breadth of this Ordinance, and seek to debate whether these types of arms are appropriate for self-defense and whether these types of prohibited weapons under the Ordinance are well suited to the core lawful purpose as expressed in *Heller*. The County's findings, as enunciated in the 1993 version of the Ordinance prior to its current amendment, were that "there is no legitimate sporting purpose for the military style assault weapons now being used on our streets"; and "assault weapons are twenty times more likely to be used in the commission of a crime than other kinds of weapons." Cook County Ordinance No. 93-O-37. The County maintains that these assault weapons have particular characteristics that render these weapons more dangerous than ordinary weapons typically possessed by law-abiding citizens for lawful purposes. It asserts that the Ordinance targets semiautomatic firearms that enable shooters to discharge high numbers of shots rapidly and have other features conducive to criminal applications.

¶ 49    Plaintiffs seek to present evidence to support their allegation that this particular Ordinance encompasses a myriad of weapons that are typically possessed by law-abiding citizens for lawful purposes and fall outside the scope of the dangers sought to be protected

under the Ordinance. Without a national uniform definition of assault weapons from which to judge these weapons, it cannot be ascertained at this stage of the proceedings whether these arms with these particular attributes as defined in this Ordinance are well suited for self-defense or sport or would be outweighed completely by the collateral damage resulting from their use, making them "dangerous and unusual" as articulated in *Heller*. This question requires us to engage in an empirical inquiry beyond the scope of the record and beyond the scope of judicial notice about the nature of the weapons that are banned under this Ordinance and the dangers of these particular weapons.

¶ 50        We recognize that the other courts that have addressed the scope issue in relation to assault weapons have taken varying approaches in varying contexts. In *People v. James*, 94 Cal. Rptr. 3d 576 (Cal. Ct. App. 2009), in the context of a criminal prosecution post-*Heller*, the California court of appeals held that a particular assault weapon was not protected by the second amendment. *Id*. at 585. The court's finding was based upon the legislature's hearings and codified findings that these weapons were unusual and dangerous. The legislature found that an assault weapon " 'has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.' " *Id*. at 585. The court declared based on the legislative finding that assault weapons are "at least as dangerous and unusual as the short-barreled shotgun" and described them as "weapons of war." *Id*. at 586.

¶ 51        In *Heller II*, in ruling on a motion for summary judgment, the court found that based upon the record before it, which included legislative findings, it could not ascertain whether the assault weapons as defined by the District of Columbia ordinance were commonly used or were useful for self-defense and, therefore, whether the prohibitions meaningfully affected the right to keep and bear arms. *Heller II*, 2011 WL 4551558, at *13. Instead, the court of appeals chose to presume a right protected by the second amendment and proceeded to apply intermediate-scrutiny review. *Id*.

¶ 52        Nevertheless, given the procedural posture of this case, we need not choose either of these approaches at this time. Unlike *James* and *Heller II*, we have a minimal legislative record to review and need not make assumptions without first attempting to ascertain relevant facts. Additionally, our deference to a legislative finding is a balancing of competing interests. As the Supreme Court has indicated in the context of fundamental first amendment rights, a legislative declaration does not preclude inquiry by the judiciary into the facts bearing on an issue of constitutional law. *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843 (1978) ("Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake."). We note that unlike *Heller II*, the County has not had an opportunity to present evidence to justify the nexus between the Ordinance and the governmental interest it seeks to protect. Pursuant to section 2-615 of the Code, we cannot say at this point that it is clearly apparent that no set of facts can be proved that would entitle plaintiffs to relief on count IV. Accordingly, for these reasons, we reverse the trial court's dismissal of the first amended complaint with respect to count IV and remand to the trial court for further proceedings.

¶ 53                                          Equal Protection

¶ 54        Lastly, we consider plaintiffs' equal protection challenge. Plaintiffs allege that the Ordinance violates the equal protection clause under the due process clause of the fifth and fourteenth amendments. Specifically, plaintiffs allege that the Ordinance arbitrarily differentiates between identically situated persons by banning specifically listed assault weapons, but not banning possession of other identical firearms. For example, plaintiffs assert that there are a number of firearms that are not "copies or duplicates" of listed firearms under the Ordinance because they have features that make them easier for left-handed shooters to use, but are identical in function. Therefore, plaintiffs maintain that the person who owns the listed firearm is treated differently than a person who owns a functionally identical firearm. We disagree.

¶ 55        The equal protection clause has generally been held to protect against inappropriate classifications of people, rather than things. See *Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002). Plaintiffs assert that because individuals have an interest in things, classifications of these things can be challenged on equal protection grounds. Nevertheless, we need not engage in the scope of the equal protection clause here in order to resolve the issue presented because even under an equal protection analysis, the Ordinance meets those requirements.

¶ 56        Plaintiffs' construction of the Ordinance runs afoul of the long-standing rules of statutory construction. As the County notes, section 54-211(7) is part of a broader legislative scheme and is not to be read in isolation. *Marshall*, 242 Ill. 2d at 292. Subsection (7) offers a nonexhaustive list of weapons along with "copies or duplicates." In addition, section 54-211(1) through (6) defines the types of weapons prohibited by listing specific technical characteristics of the weapon. Thus, when read in its entirety, the Ordinance does not arbitrarily differentiate between two owners with similar firearms because the banned firearms are either listed, a copy or duplicate, or fall under the characteristics-based test. Accordingly, we find the trial court properly dismissed count VI of the first amended complaint.


¶ 57                                          CONCLUSION

¶ 58        For the foregoing reasons, we hold that the Ordinance does not violate the due process and equal protection clauses of the United States Constitution and therefore affirm the judgment of the appellate court and trial court dismissing count I and count VI of the first amended complaint. Additionally, we hold that plaintiffs have sufficiently pleaded a cause of action to withstand a section 2-615 motion to dismiss on their second amendment challenge under count IV of the first amended complaint. Accordingly, we affirm in part and reverse in part, and remand to the trial court for further proceedings on count IV.

¶ 59       Affirmed in part and reversed in part.

¶ 60       Cause remanded.