2020 IL App (2d) 190480-U
Nos. 2-19-0480 & 2-19-0829 cons.
Order filed June 18, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| MICHAEL K. NUTTER, | ) | of Kane County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 17-D-734 |
| | ) | |
| CRISTIE L. NUTTER, | ) | Honorable |
| | ) | Rene Cruz, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

## ORDER

¶ 1    *Held*: The trial court's finding as to the husband's average income was not against the manifest weight of the evidence. The trial court did not abuse its discretion in determining the amount and duration of the maintenance award and in denying the husband's motion to reconsider the maintenance award based upon a claim of newly discovered evidence regarding a decrease in his income. The trial court did not err in dismissing the husband's motion to modify the maintenance award. The trial court's valuation of the husband's partnership interest was not against the manifest weight of the evidence and the equal allocation of his capital account was not an abuse of discretion. The trial court's valuation of a savings account titled in the husband's name was not against the manifest weight of the evidence and the equal allocation of the account was not an abuse of discretion.

¶ 2    This consolidated appeal arises out of a dissolution of marriage proceeding between petitioner, Michael K. Nutter, and respondent, Cristie L. Nutter. Michael appeals the dissolution judgment, the trial court's order granting in part and denying in part his motion to reconsider the dissolution judgment, and the trial court's order granting Cristie's motion to strike and dismiss Michael's motion to modify maintenance. Michael challenges the award of maintenance to Cristie, the valuation and allocation of his law firm partnership interest, and the valuation and allocation of a savings account titled in his name. For the reasons set forth below, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4    Michael and Cristie were married on September 21, 1997. They have two children: a daughter and son who, at the time of trial, were 19 and 16 years old, respectively. Cristie filed a petition for dissolution of marriage in March 2016 but voluntarily dismissed the action two months later when the parties attempted to reconcile. The reconciliation was ultimately unsuccessful, and Michael filed a petition for dissolution of marriage on June 6, 2017.

¶ 5    The parties entered into two agreed orders on December 1, 2017. Pursuant to the first agreed order, Michael was required to pay Cristie, beginning January 1, 2018, monthly temporary maintenance in the amount of $11,593 and monthly temporary child support in the amount of $1301. Pursuant to the second agreed order, the parties' marital home was valued at $2.2 million and Michael was ordered to pay Cristie $1.1 million to buy out her interest in the marital home and enable her to purchase a separate residence. Each party was deemed to have received a $1.1 million advance from the marital estate, and the parties' respective residences were designated their nonmarital property. The parties physically separated on December 28, 2017, and thereafter entered into an agreed allocation judgment and parenting plan. The trial court subsequently entered an order on May 10, 2018, granting Cristie's petition for temporary allocation of expenses and

awarding Cristie and Michael each $250,000 as an advance on their interest in the marital estate. A trial with respect to the remaining financial issues proceeded on December 3, 4, and 5, 2018. Michael and Cristie were the only witnesses to testify. The following is derived from their testimony and the exhibits submitted at trial.

¶ 6 At the time of trial, Michael was 49 years old, and Cristie was 44 years old. They met when they were in college at the University of Illinois-Chicago. In 1994, Michael earned a bachelor of science in chemical engineering; in 1997, Cristie earned a bachelor of science in biomedical engineering. Michael proceeded to law school and earned a juris doctorate from Chicago-Kent College of Law in 1997. At the time of their marriage in September 1997, Michael and Cristie lived in an apartment in the West Loop neighborhood of Chicago. Michael became a licensed patent attorney and worked as an associate at an intellectual property law firm, earning an approximate annual salary of $72,000. Cristie worked for Cook County Hospital, earning approximately $11 to $15 per hour.

¶ 7 In the fall of 1998, the parties built a townhome in East Aurora for $140,000. Their daughter was born in 1999. During this time frame, Michael transitioned to an associate position at a larger intellectual property law firm, and his annual salary increased to approximately $90,000. Cristie transitioned to the position of a technician for hospital ultrasound machines at Hewlett-Packard. Given the parties' work schedules, their daughter attended a day care facility during the work week from 7 a.m. to 6 p.m.

¶ 8 In mid-2000, the parties built a four-bedroom home on one-half acre in South Elgin for approximately $480,000. Around this time, Michael transitioned to an associate position at a national law firm, and his annual salary increased to approximately $150,000. In 2001, Cristie was promoted to the position of solution delivery consultant, assisting in the design of medical care

units in hospitals. Her employer had become Philips Healthcare after Philips Healthcare acquired the Hewlett-Packard business. She earned an annual salary (although the record does not specify the amount at this point) with potential for bonus or additional compensation as well as other benefits, including a company car.

¶ 9       The parties' son was born in 2002. Michael thereafter transitioned to a different national law firm, and his annual salary increased to approximately $165,000. By this point, Cristie's work schedule allowed her the flexibility to drop off and pick up the children from school and other activities. In 2004, Michael became an associate at the law firm of Winston & Strawn LLP (Winston & Strawn) with an increased annual salary of approximately $175,000. He was elected to income partnership in 2008 with an increased annual salary of approximately $300,000.

¶ 10      Michael became a capital partner at Winston & Strawn in 2012. He testified at length regarding his annual compensation in this role. As a capital partner, he acquired an equity interest in the firm provided through an award of points that a partner purchases. The points reflect the amount of the partner's interest in the firm, and the partner's compensation is tied to the firm's fiscal year profitability based upon the number of the partner's points. The maximum amount of points a partner may have is 25. Currently, a partner may be awarded no more than four points in a fiscal year but the number of points that may be taken away is not capped. A partner's equity interest is based primarily upon business origination; accordingly, the firm may take away capital points when a partner's origination declines.

¶ 11      The firm's fiscal year is February 1 through January 31. Michael testified that his income is paid through partnership distributions, including a monthly base distribution or "draw." He also receives four annual distributions—special distributions in September and January to help pay quarterly taxes and regular distributions in February and April. Michael testified that the special

distributions are not guaranteed and depend upon the firm's profitability. Michael explained that he receives the majority of his income through the regular distributions in February and April but that the amount of the regular distributions depends upon his point value as well as the firm's profitability.

¶ 12    Michael detailed his annual compensation beginning in fiscal year 2014—his first full year as a capital partner. Each year, Michael receives a preliminary compensation statement in February, which estimates his gross fiscal year compensation, and a final compensation statement in April. The final compensation statements reflect that in fiscal year 2014, Michael had 15 points, received a monthly draw of $23,750 (totaling $285,000 for the year), and earned overall compensation of $1,115,992. In fiscal year 2015, he had 18 points, received a monthly draw of $28,500 (totaling $342,000 for the year), and earned overall compensation of $2.4 million. In fiscal year 2016, he had 21 points, received a monthly draw of $33,250 (totaling $399,000 for the year), and earned overall compensation of $3.5 million.

¶ 13    With respect to fiscal year 2017, Michael's final compensation statement reflected that he had 25 points, received a monthly draw of $39,583 (totaling $475,000 for the year), and earned overall compensation of $5 million. Michael testified that the significant increase in fiscal year 2017 was attributed to the fact that he was on trial six times that year for one of his clients resulting in that client's overall billing amounting to the third largest book of business in the firm for the year. Michael testified that he told Cristie that "this is going to be a peak *** I don't know that I'll ever have a year like this again." Moreover, Michael testified, the particular client subsequently was acquired by a client of one of his partners. Thus, Michael and his partner now split the origination credit thereby decreasing Michael's overall compensation.

¶ 14    Regarding Michael's fiscal year 2018 compensation, Michael's final compensation statement reflected that he had 24.4 points, received a monthly draw of $46,389 (totaling $556,667 for the year), and earned overall compensation of $3.291 million. Michael testified that, included in the overall compensation was an "atypical" special distribution of $234,000 based upon a successful contingency case that year.

¶ 15    At the time of the December 2018 trial, the firm was near the end of its 2019 fiscal year, which began on February 1, 2018, and ended on January 31, 2019. Michael testified that he had 25 points and received a monthly draw of $48,333 (which would total $580,000 for the year). However, Michael stated: "[I]t's already been made known to me that I'm not going to be eligible for a bonus. In fact, at least it's been hinted that I'm going to be losing a couple of points. So I expect I'll have 23 points rather than 25 points." He also testified that he was "hoping" to lose only two points but was not certain as to the number of points that might be taken away. Michael estimated that his fiscal year 2019 compensation "will probably go down about a million dollars but I won't know until February [2019]."

¶ 16    Michael further testified with respect to his partnership interest and capital account at the firm. At the time of trial, the balance of his capital account was $600,000. Michael explained that the balance of the capital account reflected the amount he had paid into the firm over the years to purchase his points or equity interest. Specifically, Michael had 25 points, which included one fixed point and one variable point. A partner does not pay for the fixed point awarded, but the cost of each of Michael's 24 variable points was $25,000.

¶ 17    The parties entered into a stipulation, entitled "Stipulation of Partnership Interest and Pension Termination," which provided in relevant part:

"The parties stipulate and agree that the value of Michael's partnership interest with Winston & Strawn, to the extent it has a value at present, is limited to at most the balance in his capital account. The parties further stipulate that pursuant to Article III of the Partnership Agreement, a copy of which is attached hereto and incorporated herein by reference only as Exhibit A, upon Michael's death, disability or withdrawal from the firm he would be entitled to a reimbursement of his then present capital account balance, if any, subject to the remaining terms of the Partnership Agreement. At present Michael is not eligible to receive a payout from this capital account and the value of it in the future, if, as and when it is disbursed, has not yet been determined. Both parties also stipulate that the present value of Michael's the [*sic*] capital account held at Winston & Strawn is in the amount of $600,000. Attached hereto and incorporated herein by reference only as Exhibit B is a [*sic*] correspondence from the Managing Director of Tax, Compensation, & Retirement Benefits dated September 21, 2018 confirming the current balance of Michael's capital account."

The September 21, 2018, correspondence was an email from the managing director, stating, *inter alia*, that "[Michael's Capital Balance is $600,000 (24 Variable Points X $25,000)]."

¶ 18    When questioned regarding the stipulation, Michael testified that he could "certainly stipulate that there's $600,000 that the firm has that I gave them for the award of 24 variable points. Whether or not that has any value to me in the future, I can't stipulate to that." Michael elaborated that the money was not currently distributable to him, not divisible, and could not be sold. He testified that while the balance of the capital account is $600,000, the value is not $600,000 because he is "not ever guaranteed to receive that money." He stated that the value of the capital account would decrease if points were taken away based on work performance and "future effort."

Moreover, Michael testified, the value of his capital account is impacted by outstanding receivables. Specifically, "if I chose to leave the firm, in a perfect world, I would leave the firm and I think the firm has three years to pay me back my capital account, however, they hold all account receivables against me." At the time of trial, Michael had approximately $2 million in receivables. Thus, Michael testified, if he "left the firm and was unable to collect $600,000 or more, they are going to take that money out of my capital contribution."

¶ 19    With respect to his future employment plans, Michael testified: "[B]ased on the fact that I was making the money I was, there was the hope and expectation that I would have the option to retire at the age of 55. I wanted to travel and see the world while I could still walk and enjoy it." Michael testified that he had general conversations with Cristie on the subject over the years. He specified a conversation in 2013 or 2014 during which he and Cristie discussed taking a three-month to six-month cruise around the world after their children graduated from college. He stated that other partners at his law firm had retired around the age of 55, and it remained his "hope and expectation" despite the dissolution of marriage to retire at the age of 55.

¶ 20    Regarding Cristie's employment status at the time of trial, Cristie testified that she resigned from her employment at Philips Healthcare in August 2016. Her wages from January 1, 2016, through August 21, 2016, were $121,849. Cristie stated that her resignation was based upon "many factors" that the parties discussed: "I was nervous because of the fact that we were going through some marital issues because [Michael] actually had said he would give me a hundred thousand dollars to put in my account to give m[e] some financial—to feel more financially secure in case something did happen further down the road[.]" Christie further testified that she "was very stressed at work and there were some things going on with the family at the time. My daughter

was auditioning for college[] [theater programs] and there was no way that I could go on these trips with her and also keep working as much as I was."

¶ 21    Michael testified that the parties discussed Cristie's desire to "take a year off while our daughter applied to colleges so she could travel with her." Cristie "wanted to spend [their] daughter's senior year with her so we agreed she could take a year off of work and then she would have to go back to work. Or it was expected she would go back to work." Michael disputed Cristie's testimony regarding his offer of $100,000. Michael testified that a year later, when their daughter was in college, he asked Cristie about her employment plans. At the time of trial, Cristie remained unemployed and testified that she had not taken any measures to seek employment. Cristie also testified that she is generally healthy and trained for and participated in ironmans and marathons between 2010 and 2016. She testified that nothing other than the stress of the divorce prevented her from working.

¶ 22    The parties described their standard of living during the marriage as "comfortable." They both worked full-time until 2016 and earned a combined income of approximately $500,000 until 2013 when Michael became a capital partner. In April 2013, the year after Michael became a capital partner, the parties purchased what Cristie described as her "dream home"—a 10,000-square-foot residence located in St. Charles on 2.14 acres. They purchased the home in cash for $1.97 million and paid an additional $10,000 for personal property. They also paid $120,000 to install a heated driveway and approximately $500,000 to renovate the home and install a pool, cabana, and pergola.

¶ 23    Regarding other expenditures during the marriage, Cristie testified that early in the marriage, they "didn't vacation very much." Rather, she and Michael vacationed once or twice a year while a grandmother cared for the children. Between the years of approximately 2004 and

2013 or 2014, the parties owned a fifth-wheel camper and pickup truck (subsequently replaced with a motor home) in which the family took vacations. Beginning around 2011 to 2012, they vacationed four times per year. Cristie further testified regarding their vacations later in the marriage. In 2014, they vacationed in Europe, Costa Rica, Hawaii, and took a Caribbean cruise. In 2015, they vacationed in Mexico, Turks & Caicos, Tampa, and New York. In 2016, they vacationed in Mexico, Alaska, and took a two-week, $50,000 vacation to Hawaii. In 2017, they vacationed in Jamaica, the Florida Keys, and took a Disney vacation. Michael, however, testified that with respect to vacations, the family vacationed twice per year—usually the week before Thanksgiving and a week for spring break. Their airfare was generally coach, and they typically stayed at Hyatt, Sheraton, Marriott, or Disney hotels.

¶ 24 Both parties testified that they belonged to a health club during the marriage but that they were never members of a country club. At the time of trial, Michael drove a 2014 Audi S7; Cristie drove a 2015 Jeep Wrangler; their daughter drove a 2007 Jeep Commander; and their son drove a 2014 BMW 550i.

¶ 25 Following the submission of written closing arguments, the trial court entered its dissolution judgment on February 28, 2019. The trial court initially set forth several findings with respect to the parties' income. As for Michael's income, the trial court found that his "income is averaged at $3.2 [m]illion per year plus additional variable compensation that is not determinable at this time." In this regard, the trial court also noted that the "compensation system has changed at Michael's employer and he now shares one of his client's receivables with a senior partner due to a client acquisition."

¶ 26 As for Cristie's income, the trial court stated that Cristie "has an advanced degree and has worked throughout the marriage earning most recently $130,000 as an [e]ngineer at Philips

Healthcare." However, the trial court found, "[b]y agreement of the parties, Cristie took a year off from work to spend time with her high school daughter, [but] she has not returned to employment outside of the home." The trial court noted that the expectation of Cristie's return to work after the year was disputed. The trial court further found that there was credible testimony and evidence that Cristie "supplements her income through the sale of clothing and other items online resulting in additional income." Accordingly, the trial court imputed $150,000 of income to Cristie.

¶ 27 The trial court turned to the allocation of assets and liabilities. The trial court incorporated a spreadsheet reflecting an allocation "intended to achieve a 50/50 division of property which this court finds pursuant to [section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West Supp. 2019))] and related case law to be equitable taking into account the contributions made by each party and the pre-distribution of marital [*sic*] and expenses during the litigation." Relevant to this appeal, the trial court found that "the parties have stipulated that Michael's capital account at Winston & Strawn has a present balance of $600,000, and the [c]ourt does find that this is marital property subject to division." Accordingly, the trial court allocated $300,000 to Michael and $300,000 to Cristie. Also relevant to this appeal, the trial court found that a savings account titled in Michael's name was marital property. The trial court valued the account at $558,158.68—the balance set forth in the October 31, 2018, account statement. The trial court therefore allocated $279,079.34 to Michael and $279,079.34 to Cristie.

¶ 28 The trial court proceeded to review the applicable statutory factors governing maintenance in determining the propriety of a maintenance award to Cristie. See 750 ILCS 5/504(a) (West Supp. 2019). In addressing the parties' income and property, the trial court considered Michael's "average $3.2[million] per year" salary and Cristie's imputed annual income of $150,000. The trial

court found that the marital estate "is worth roughly $7[million] inclusive of real estate and retirement" with a liquid estate of $2.3 million.

¶ 29    With respect to the parties' needs, the trial court found that they "enjoyed significant marital income throughout the marriage and were able to afford a marital home valued at $2.2[million]" with monthly household expenses of approximately $30,000. While in the marital home, the parties were able to "accumulate savings, retirement and vacationed comfortably." After Michael bought out Cristie's interest in the marital home, Cristie purchased a home valued at $1.1 million and added a pool and landscaping at an additional cost of approximately $400,000. While stating that both parties' current monthly expenses were significant, the trial court found "Cristie's evidence as to her monthly expenses [of approximately $32,000] to be inflated as they exceed not only Michael's current [monthly] expenses [of $26,000] on the larger marital residence but exceed the expenses [of $30,000] the parties shared while the entire family of four lived at the marital residence."

¶ 30    Regarding the realistic present and future earning capacity of the parties, the trial court noted that Michael is a partner at Winston & Strawn. The trial court found that Michael "can reasonably expect to earn a substantial living." He has "consistently earned in excess of $3.0[million] per year over the last several years, however there may be an anticipated decrease in earnings due to a change in income earning structure and a client acquisition." The trial court further noted that "Michael testified credibly that the parties had a plan to retire at age 55 with the expectation of saving enough assets to sell the marital residence, down-size their residence and move to a more tax friendly state to maintain the lifestyle they desired."

¶ 31    As for the standard of living established during the marriage, the trial court noted the value of the marital residence and found that the parties "enjoyed an elevated standard of living outside

the norms of most individuals." They drove "modest cars" but purchased a BMW for their son. Moreover, the trial court found, the parties were able to take "comfortable vacations," pay for their daughter's college tuition, and save "considerable money for retirement."

¶ 32    The trial court noted the duration of the marriage—19 years and eight months prior to the filing of Michael's dissolution petition. It also found that the parties are "both relatively young and healthy" with Michael a partner in a law firm having an "exceptional skill set" and earning a "substantial salary" and Cristie "employable but nowhere near the level" of Michael's earning capacity. The trial court addressed the issue of any contributions and services of Cristie, as the party seeking maintenance, to Michael's career. The trial court stated that both parties worked throughout the marriage and contributed to caring for the children and running the household, using day care and other services as necessary. The trial court concluded that while Cristie "enjoyed the relatively recent opportunity to dedicate time to triathlons and other competitions, [] her involvement in the home [] made it easier for Michael to excel in his career, letting him travel for work, stay late and focus on his client's [*sic*] and career." Accordingly, having considered the applicable statutory factors, the trial court determined that an award of maintenance was proper.

¶ 33    The trial court turned to the amount and duration of the maintenance award. In formulating the award, the trial court initially noted that the statutory guidelines set forth in the Act did not apply because the parties' combined gross annual income exceeded $500,000. See 750 ILCS 5/504(a), (b-1)(1)(A) (West Supp. 2019). The trial court awarded Cristie maintenance in the amount of $28,000 per month "as necessary to maintain the lifestyle the parties were accustomed to during the marriage including the ability to further save for retirement" and based upon the total of Michael's monthly draw. The trial court also found that, based upon the length of the marriage, Cristie was entitled to maintenance for 15 years and nine months. In determining the maintenance

award, the trial court reiterated that Michael's income was "conservatively averaged to $3.2[million] per year" based upon "the last several years and discounting the substantial bonus Michael received in 2017" and Cristie's imputed annual income was $150,000. The trial court further stated that it had considered the "parties' incomes, the allocation of marital assets, each parties' non[]marital estate, the lifestyle the parties established during the marriage, needs, and all other relevant statutory factors pursuant to [section 504 of the Act] and related case law."

¶ 34    Michael timely filed a motion to reconsider the dissolution judgment. In relevant part, he challenged the trial court's calculation of the parties' income and the amount of the maintenance award. Michael argued that Cristie's imputed income should have been $229,550, not $150,000, because had she remained employed through the end of 2016, she would have earned $209,550 plus $20,000 from her sale of clothing and other items online. Michael also argued that the trial court erroneously found that he was guaranteed an annual income of $3.2 million plus additional compensation. According to Michael, he "credibly testified that he is guaranteed only a monthly *pro rata* share based on his capital points awarded to him (*i.e.*, his draw)," and in fiscal year 2019, his monthly draw only totaled $580,000 with his remaining compensation variable and not guaranteed. Additionally, Michael submitted as an exhibit to the reconsideration motion his preliminary compensation statement for fiscal year 2019, dated February 14, 2019, which reflected the total of $580,000 in income from his monthly draw and an expected overall compensation of $2.86 million. He argued that the statement was newly discovered evidence not in existence at the time of the December 2018 trial. He also stated in his motion that he had been informed that he could lose as many as 10 capital points in fiscal year 2020—eight more points than the two points he had anticipated losing at the time of trial.

¶ 35    By the time Michael filed his reply in support of his reconsideration motion, he had obtained his final fiscal year 2019 compensation statement, dated April 12, 2019, as well as his fiscal year 2020 compensation and capital report. The final compensation statement confirmed the total of $580,000 in income from his monthly draw and overall compensation of $2.86 million for fiscal year 2019. The compensation and capital report reflected the loss of 10 capital points for fiscal year 2020, leaving Michael with 15 capital points, and a corresponding reduction of his total monthly draw for the year from $580,000 to $380,000 (or $31,667 per month). Michael alternatively sought to reopen proofs to include the fiscal year 2020 compensation and capital report.

¶ 36    In his motion to reconsider the dissolution judgment. Michael also challenged the valuation and allocation of his Winston & Strawn partnership interest. Michael argued that he presented unrefuted testimony that his partnership interest has no present value beyond the income he receives for work performed and that any future value is a mere expectancy. He asserted that the trial court erred in finding that the parties stipulated to a $600,000 value for the partnership interest, as the stipulation provided  that "to the extent it has a value at present," the partnership interest should be capped at the $600,000 in his capital account at the time. Alternatively, Michael posited that the trial court should treat the capital account like an unvested retirement asset from which, if and when he receives a payout, Cristie would receive a *pro rata* share.

¶ 37    And finally, Michael's motion to reconsider the dissolution judgment included a challenge to the valuation and allocation of the savings account titled in his name. While the trial court valued the account at $558,158.68 pursuant to the balance set forth in the October 31, 2018, statement, Michael asserted that the account should have been valued at $208,158.68 pursuant to the balance set forth in the November 7, 2018, account statement. According to Michael, "the funds withdrawn

reflect a withdrawal to pay income taxes owed by Michael and, since the tax liability for 2018 for either party has not been allocated, to value this savings account at a higher level is tantamount to yet another windfall to Cristie" by inflating the marital estate by approximately $350,000 and "artificially divid[ing] between the parties funds that do not exist." Michael submitted as an exhibit to his reply in support of his reconsideration motion bank statements reflecting income tax payments made on November 6, 2018. Alternatively, Michael sought to have the marital tax liability of $350,000 allocated equally between the parties.

¶ 38    The trial court heard argument on Michael's reconsideration motion, and on May 7, 2019, entered an order granting in part and denying in part the motion. The trial court found that it had erred in determining Cristie's imputed income and increased the amount of the imputed income to $229,550. In turn, the trial court reduced the monthly maintenance award from $28,000 to $23,000. The trial court denied reconsideration with respect to Michael's remaining arguments, stating that it found "no changes in the law, errors in the [c]ourt's previous application of existing law, or newly discovered evidence which was not available at the time of trial to grant additional relief ***." Specifically, regarding Michael's income, the trial court reasoned that "[a]ll factors raised in [Michael's reconsideration motion] with respect to this issue were contemplated by the [c]ourt in its [j]udgment." The trial court did not explicitly address Michael's alternative request to reopen proofs. With respect to Michael's partnership interest, the trial court noted that "[t]he parties stipulated to the present value of the [Michael's] Winston and Strawn capital account and the [c]ourt finds that it is subject to division." And as for the valuation of the savings account, the trial court found "no basis to re-assess the value of this account past the October 31, 2018[,] valuation of the parties' assets and it remains subject to division at $558,158.68."

¶ 39    On June 6, 2019, Michael timely appealed the dissolution judgment and the order disposing of his reconsideration motion. On July 24, 2019, Michael also filed a motion to modify maintenance pursuant to section 510 of the Act (750 ILCS 5/510 (West Supp. 2019)) on grounds that he had experienced a substantial change in circumstances affecting his income. Namely, he argued that his annual income declined in fiscal year 2019 to approximately $2.8 million—a substantial decrease from the $3.2 million amount upon which the trial court based the maintenance award. Moreover, Michael asserted, he anticipated that his total compensation for fiscal year 2020 would decrease by 40% from approximately $2.8 million to approximately $1.7 million in light of the 40% reduction in his capital points from 25 points to 15 points. Michael further stated that he relies upon the majority of his current monthly draw of $31,667 to pay his maintenance and child support obligations. Thus, he has been required to deplete his savings to pay his own living expenses. Michael argued that this result violated the trial court's intention to order an equal allocation of assets.

¶ 40    Cristie filed a motion to strike and dismiss Michael's motion to modify maintenance pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 5/2-619 (West 2018)). She argued that the motion should be dismissed pursuant to section 2-619 for lack of jurisdiction in light of the pending appeal of the dissolution judgment and order disposing of his reconsideration motion. She also argued that the motion should be stricken as factually insufficient pursuant to section 2-615 because the reduction in Michael's income was considered by the trial court in its dissolution judgment. Moreover, Cristie argued, the anticipated further reduction in income was speculative and not a substantial change in circumstances.

¶ 41    On September 18, 2019, following argument on Cristie's motion to strike and dismiss Michael's motion to modify maintenance, the trial court granted Cristie's motion pursuant to

section 2-615. The trial court reasoned, "I don't see a substantial change at this point," and found Michael's motion to modify maintenance "a little bit preemptive and anticipatory." Regarding Michael's attempt to rely upon his future compensation, the trial court stated: "I don't know that we can do that based upon we take an average of the income over the last several years in order to get to the numbers that I did and the format that I set out, the structure. I believe that we are a little bit ahead of the horse on this one." In light of its ruling, the trial court stated that it need not address Cristie's request to dismiss the motion pursuant to section 2-619 for lack of jurisdiction. In its written order, the trial court dismissed the motion to modify maintenance and included a finding of appealability pursuant to Supreme Court Rule 304(a) in light of other post-dissolution matters pending between the parties. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016). On September 20, 2019, Michael appealed the order dismissing his motion to modify maintenance. We granted Michael's motion to consolidate the appeal from the dismissal order with his appeal from the dissolution judgment and order disposing of his reconsideration motion.

¶ 42                                    II. ANALYSIS

¶ 43    Michael raises four central arguments. He challenges the maintenance award on grounds that the trial court erroneously determined his income as well as the amount and duration of maintenance and improperly denied his motion to reconsider based upon newly discovered evidence. Michael also argues that the trial court erroneously dismissed his motion to modify the maintenance award, as he sufficiently pled a reduction in his income as the basis for modification of the award. Michael further challenges the valuation and allocation of his partnership interest at Winston & Strawn. He contends that the trial court erroneously construed the parties' stipulation as to the value of his capital account. And finally, Michael challenges the valuation and allocation of the savings account titled in his name. He contests the valuation of the savings account as well

the trial court's characterization of the account as marital property. We address each argument in turn.

¶ 44                          A. Maintenance Award

¶ 45     An award of maintenance in a dissolution proceeding is governed by section 504 of the Act (750 ILCS 5/504 (West Supp. 2019)). The trial court "may grant a maintenance award for either spouse in amounts and for periods of time as the court deems just ***." 750 ILCS 5/504(a) (West Supp. 2019). Section 504(a) of the Act sets forth a list of factors for the trial court to consider, where relevant, in determining whether a maintenance award is appropriate. 750 ILCS 5/504(a)(1-14) (West Supp. 2019). The factors include: (1) the income and property of each party, including the marital property apportioned and the nonmarital property assigned to the party seeking maintenance; (2) the parties' needs; (3) the parties' realistic present and future earning capacity; (4) any impairment of the realistic present and future earning capacity of the party seeking maintenance due to that party's devotion of time to domestic duties or having forgone or delayed education or training, employment, or career opportunities due to the marriage; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought; (6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each party; (10) all sources of public and private income, including, without limitation, disability and retirement income; (11) the tax consequences to each party; (12) the contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and (14) any other factor that the trial court expressly finds just and equitable. *Id.*

¶ 46    A trial court's award of maintenance is generally presumed to be correct. *In re Marriage of Brill*, 2017 IL App (2d) 160604, ¶ 26. A maintenance award is a matter within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Id.* A trial court abuses its discretion when its decision is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with its determination. *Seymour v. Collins*, 2015 IL 118432, ¶ 41. The trial court's factual findings regarding maintenance, such as the determination of a party's income, will be set aside only if the findings are against the manifest weight of the evidence. *Brill*, 2017 IL App (2d) 160604, ¶ 30; *In re Marriage of Wojcik*, 362 Ill. App. 3d 144, 153 (2005). A finding of fact is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence. *Brill*, 2017 IL App (2d) 160604, ¶ 30.

¶ 47                                  1. Michael's Income

¶ 48    Michael's challenge to the maintenance award revolves primarily around his contention that the trial court's determination as to his income was against the manifest weight of the evidence.[1] Michael argues that his compensation statements and unrefuted testimony established that his only guaranteed income is his monthly draw and that his remaining compensation in the form of annual distributions varies depending upon his originations, capital points, and the firm's

---

[1] While the trial exhibits reflect both annual and fiscal year compensation, the trial testimony and the parties' arguments are framed around Michael's fiscal year compensation. We likewise discuss Michael's income by fiscal year.

profitability. The highest monthly draw Michael ever earned totaled $580,000 for fiscal year 2019. Thus, Michael contends, the "[the trial court] incorrectly found that Michael's yearly *guaranteed* income averaged to $3.2 million, and improperly inflated that incorrect amount by further finding in error that he would receive variable compensation *in addition* to the $3.2 million." In other words, Michael's position is that the trial court found that Michael's monthly draw, as well as his annual distributions—comprising the majority of his compensation, are all guaranteed. The record belies this assertion.

¶ 49    The trial court found in the dissolution judgment that Michael's "income is averaged at $3.2 [m]illion per year plus additional variable compensation that is not determinable at this time." The trial court consistently referred to Michael's average annual income of $3.2 million. But, as counsel for Michael acknowledged at oral argument, nowhere in the dissolution judgment did the trial court state that Michael's average annual income of $3.2 million was guaranteed. To the contrary, the trial court recognized that despite Michael's income over the last several years, "there may be an anticipated decrease in [Michael's] earnings due to a change in income earning structure and a client acquisition." Michael reads in the word "guaranteed" to the trial court's finding as to his average annual income by juxtaposing it with the trial court's finding that Michael's income also included undeterminable, variable compensation. At oral argument, counsel for Michael asserted that this was the only reasonable conclusion that could be drawn from the trial court's judgment. However, the finding as to Michael's undeterminable and variable additional compensation did not translate to a finding that Michael's average income was guaranteed. Rather, the point was that the trial court discounted what it considered to be additional undeterminable and variable compensation in calculating the average amount of Michael's income for the last several years.

¶ 50    The trial court's method of determining Michael's income was entirely appropriate. In situations where the payor spouse's income varies from year to year, the trial court may average the income over several years to determine the maintenance obligation. See *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1024-25 (2003); *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995). The maximum number of years to consider when income-averaging is within the discretion of the trial court in light of the varying facts in each case, although "[a]t least the three prior years should be used to obtain an accurate income picture." *Freesen*, 275 Ill. App. 3d at 103. This is precisely what the trial court did here. The trial court found that Michael's income was "conservatively averaged to $3.2[million] per year" based upon "the last several years and discounting the substantial bonus Michael received in 2017." This finding is based on the evidence in the record. Michael's compensation statements for the last four fiscal years reflect overall compensation of $2.4 million in fiscal year 2015, $3.5 million in fiscal year 2016, $5 million in fiscal year 2017, and $3.291 million in fiscal year 2018. Straight averaging of these figures yields a sum of $3,547,750. The trial court "conservatively averaged" and discounted the bonus in 2017 in arriving at its finding that Michael's average annual income was $3.2 million. Michael provides no persuasive basis upon which to conclude that an opposite conclusion is clearly evident or that the trial court's finding is unreasonable, arbitrary, or not based on the evidence.

¶ 51    Michael nevertheless maintains that the trial court improperly denied his motion to reconsider the dissolution judgment based upon newly discovered evidence as to his income. "The purpose of a motion to reconsider is to bring to the trial court's attention a change in the law, an error in the trial court's previous application of existing law, or newly discovered evidence that was not available at the time of the prior hearing or decision." See *Horlacher v. Cohen*, 2017 IL

App (1st) 162712, ¶ 79. Where, as here, the motion to reconsider is based upon a claim of newly discovered evidence, the standard of review is abuse of discretion. *Id.* ¶ 80.

¶ 52    Michael contends that his preliminary and final compensation statements for fiscal year 2019 and his compensation and capital report for fiscal year 2020, all of which post-dated the trial, constituted newly discovered evidence of the significant reduction in his current income. Specifically, the compensation statements reflected a total of $580,000 in income from his monthly draw and overall compensation of $2.86 million for fiscal year 2019. The compensation and capital report reflected the loss of 10 capital points for fiscal year 2020 and a reduction of his total monthly draw from $580,000 to $380,000.

¶ 53    The trial court disagreed that the documents constituted newly discovered evidence warranting rehearing. The trial court reasoned that it had already contemplated in the dissolution judgment all factors raised in the reconsideration motion with respect to the issue of Michael's income. We cannot say that this determination was arbitrary, fanciful, or unreasonable or a decision with which no reasonable person would agree. Newly discovered evidence must be material and "so conclusive that it would probably change the trial result." *In re Marriage of Wolff*, 355 Ill. App. 3d 403, 409 (2005). Michael testified at trial regarding the anticipated reduction in his income. Indeed, he acknowledges as much in arguing on appeal that the fiscal year 2019 compensation statements and fiscal year 2020 compensation and capital report "fully supported [his] trial testimony that his compensation had declined and will continue to decline in comparison to prior years." Michael testified that the client for which he received significant origination credit in fiscal year 2017 was acquired by his partner's client. Michael and his partner now split the origination credit, thereby decreasing Michael's overall compensation. Michael further testified that while he had 25 points at the time of trial, "it's already been made known to me that I'm not

going to be eligible for a bonus" and that "it's been hinted that I'm going to be losing a couple of points." He stated that he was "hoping" to lose only two points but was not certain as to the number of points that might be taken away. He further estimated that his fiscal year 2019 compensation would decline by a million dollars.

¶ 54    A review of the dissolution judgment reflects the trial court's explicit consideration of Michael's testimony regarding the anticipated reduction in his income. The trial court noted with respect to Michael's income that the "compensation system has changed at Michael's employer and he now shares one of his client's receivables with a senior partner due to a client acquisition." In discussing Michael's future earning capacity, the trial court reiterated that while Michael has consistently earned in excess of $3 million over the last several years, "there may be an anticipated decrease in earnings due to a change in income earning structure and a client acquisition." Accordingly, Michael failed to establish that the evidence was material and so conclusive that it would have changed the trial result. Thus, the trial court did not abuse its discretion in denying Michael's motion to reconsider the dissolution judgment based upon his claim of newly discovered evidence as to his income.

¶ 55    Michael's argument that the trial court erroneously failed to reopen proofs to include the fiscal year 2020 compensation and capital report fares no better. Initially, we note that Michael's request to reopen proofs is subject to forfeiture, as he raised it for the first time in his reply brief in support of his motion to reconsider. See *Shakari v. Department of Financial & Professional Regulation*, 2018 IL App (1st) 170285, ¶ 34 ("Arguments raised for the first time in a reply brief are [] subject to forfeiture."). However, Cristie did not argue that Michael forfeited the issue by failing to raise it in the initial motion. See *People v. De La Paz*, 204 Ill. 2d 426, 433 (2003) (a party may forfeit a forfeiture argument by failing to argue it). Moreover, there was no dispute that the

fiscal year 2020 compensation and capital report—the subject of the request to reopen proofs—was not available until Michael filed his reply brief. We therefore address the issue.

¶ 56     The factors to consider in determining whether to reopen proofs are whether the moving party has provided a reasonable excuse for failing to submit the evidence at trial, whether granting the motion would result in surprise or unfair prejudice to the opposing party, and whether the evidence is of the utmost importance to the movant's case. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 55. Greater liberty should be accorded to reopening proofs in bench trials. *Id.* We review the denial of a motion to reopen proofs for an abuse of discretion. *Id.* ¶ 54. "A trial court does not abuse its discretion in denying a motion to reopen proofs where the evidence sought to be introduced is not of utmost importance and will not materially alter the trial court's judgment." *In re Marriage of Liszka*, 2016 IL App (3d) 150238, ¶ 64.

¶ 57     In resolving Michael's motion to reconsider, the trial court did not explicitly address Michael's alternative request to reopen proofs although its rationale for denying reconsideration based upon the claim of newly discovered evidence applies with equal force. Michael failed to establish that the fiscal year 2020 compensation and capital report was of utmost importance to his case. As set forth above, Michael testified regarding the anticipated reduction in his income for fiscal year 2020 and acknowledged the looming reduction in his points. The trial court explicitly considered Michael's testimony regarding the anticipated reduction in his income. Accordingly, there is no basis upon which to hold that the trial court should have granted Michael's request to reopen proofs to include the fiscal year 2020 compensation and capital report, as the record establishes that the evidence would not have altered the trial court's judgment.

¶ 58                              2. Amount and Duration of Maintenance

¶ 59    Michael maintains a challenge to the amount and duration of the maintenance award. He argues that the amount of the maintenance award, which was reduced to $23,000 per month upon reconsideration, and its duration of 15 years and nine months were unreasonable based upon the evidence submitted at trial. If the trial court determines that an award of maintenance is appropriate, then the trial court must set the amount and duration of maintenance. 750 ILCS 5/504(b-1) (West Supp. 2019). Where, as here, the parties' combined gross annual income exceeds $500,000, the statutory guidelines governing the amount and duration of maintenance do not apply, and the trial court may impose an award of maintenance after consideration of the relevant statutory factors set forth in section 504(a) of the Act. 750 ILCS 5/504(a), (b-1)(2) (West Supp. 2019).

¶ 60    Michael argues that the maintenance award amounted to a windfall to Cristie in light of the assets she received in the dissolution judgment and the income she could earn from investing the liquid assets. However, "[a] party should not be required to expend [his or] her assets in order to live at something approximating the standard of living enjoyed during the marriage." *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 104. The record demonstrates that the trial court considered the marital property apportioned to Cristie in setting the amount of maintenance.

¶ 61    Michael nevertheless contends that the maintenance award was unreasonably high in light of Cristie's inflated monthly expenses and the testimony that the parties' lifestyle during the marriage was merely comfortable. Maintenance is designed to allow the recipient spouse to retain the standard of living enjoyed during the marriage. *In re Marriage of Micheli*, 2014 IL App (2d) 121245, ¶ 24. " 'A spouse should not be required to lower the standard of living established in the marriage as long as the payor spouse has sufficient assets to meet his [or her] needs and the needs of his [or her] former spouse.' " *In re Marriage of Shen*, 2015 IL App (1st) 130733, ¶ 87 (quoting

*In re Marriage of Walker*, 386 Ill. App. 3d 1034, 1044 (2008)). While the record reflects that the trial court found Cristie's stated monthly expenses to be inflated, the record also demonstrates that the trial court considered as much in determining the amount of the maintenance award. Moreover, the trial court reviewed the evidence with respect to what it found to be an elevated standard of living established during the marriage and awarded maintenance in an amount "as necessary to maintain the lifestyle the parties were accustomed to during the marriage including the ability to save for retirement." In this regard, the trial court noted the $2.2 million value of the parties' marital home with monthly household expenses of approximately $30,000. The trial court also noted the parties' comfortable vacations, the purchase of a BMW for their son, the ability to pay for their daughter's college tuition, and the ability to save considerable money for retirement. Michael fails to identify any persuasive basis upon which to challenge the amount of the maintenance award.

¶ 62    Michael also challenges the 15-year, nine-month duration of the maintenance award. We note that while the statutory guidelines set forth in the Act did not apply in light of the amount of the parties' combined gross annual income, the trial court essentially set the duration of the maintenance award at the statutory guideline amount of 80% of the length of the marriage (which was 19 years and eight months at the time the dissolution petition was filed). See 750 ILCS 5/504(b-1)(1)(B) (West Supp. 2019). Michael contends that the duration was unreasonable in light of his testimony that he planned to retire at the age of 55—approximately five years after the date of the dissolution judgment. He argues that the trial court should have made the maintenance award reviewable at the contemplated time of his retirement. However, the purpose of reviewable maintenance is to allow the trial court to reserve jurisdiction over an award of maintenance "to encourage a spouse to become self-sufficient while providing the court with an opportunity to

review the award at the end of a fixed period to determine what efforts the spouse has made toward achieving this objective and whether those efforts have been successful." *In re Marriage of Pearson*, 236 Ill. App. 3d 337, 348 (1992). Here, while Cristie was not employed at the time of trial, the trial court imputed income in the amount of $229,550 to Cristie. Michael never articulated any need to reserve jurisdiction to review Cristie's efforts at self-sufficiency under these circumstances. In sum, the record establishes no basis upon which to hold that the trial court abused its discretion in determining the amount and duration of the maintenance award. In turn, the trial court properly denied Michael's motion for reconsideration on this issue, as it raised essentially the same argument.

¶ 63                                      B. Motion to Modify Maintenance

¶ 64    Maintenance may be modified by a court pursuant to section 510(a)(1)(a-5) of the Act (750 ILCS 5/510(a)(1)(a-5) (West Supp. 2019)) only upon a showing of a substantial change in circumstances. A substantial change of circumstances as required under the statute means that either the needs of the spouse receiving maintenance or the ability of the other spouse to pay the maintenance has changed. *Shen*, 2015 IL App (1st) 130733, ¶ 132. The party seeking modification bears the burden of establishing a substantial change in circumstances. *Id.* The statute sets forth factors for the trial court to consider in resolving a petition to modify maintenance, including "the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought." 750 ILCS 5/510(a-5)(7) (West Supp. 2019). The statute also instructs that the trial court shall consider the factors set forth in section 504(a)(1-14) of the Act that were assessed in determining the initial award. 750 ILCS 5/504(a-5) (West Supp. 2019)). A trial court's ruling on a petition for modification of maintenance will not be reversed absent an abuse of discretion. *Shen*, 2015 IL App (1st) 130733, ¶ 135.

¶ 65    However, the trial court did not rule on a petition for modification of maintenance. Rather, it granted Cristie's motion to strike and dismiss Michael's motion to modify maintenance pursuant to section 2-615. We review the procedural posture to place the scope of our review in context. The trial court's written order following its ruling at the hearing on Cristie's motion to strike and dismiss Michael's motion to modify maintenance stated that it granted Cristie's motion pursuant to section 2-615 and "dismissed" the motion to modify maintenance. But the relief Cristie sought pursuant to section 2-615 was to strike the motion as factually insufficient; the relief she sought pursuant to section 2-619 was to dismiss the motion for lack of jurisdiction. While not addressed by the trial court or the parties on appeal, we note that the trial court had jurisdiction to entertain Michael's motion to modify maintenance notwithstanding his pending appeal of the dissolution judgment and the order disposing of his reconsideration. See *In re Marriage of Petramale*, 102 Ill. App. 3d 1049, 1052-53 (1981) (holding that the trial court had jurisdiction to hear a petition to modify an award of child support while an appeal from the original order of support was pending). In any event, the record demonstrates that the trial court dismissed Michael's motion to modify maintenance on grounds that it was factually insufficient pursuant to section 2-615, and we review that ruling.

¶ 66    A dismissal motion premised upon section 2-615 challenges the legal sufficiency of the complaint based upon defects apparent on its face. *Wilson v. County of Cook*, 2012 IL 112026, ¶ 14. The critical inquiry in resolving a section 2-615 motion to dismiss is whether the allegations in the pleading, considered in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Id.* A cause of action will be dismissed pursuant to section 2-615 "only if it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief." *Id.* We review *de novo* an order granting a section 2-615 motion to dismiss. *Id.*

¶ 67   Michael contends that he sufficiently pled a cause of action for modification of the maintenance award based upon a substantial change of circumstances, namely, the decrease in his income subsequent to entry of the dissolution judgment. See 750 ILCS 5/510(a-5)(7) (West Supp. 2019). He alleged that his total compensation decreased from $3.291 million in fiscal year 2018 to $2.86 million in fiscal year 2019; he lost 10 capital point in fiscal year 2020; and the total annual amount of his monthly draw decreased from $580,000 in fiscal year 2019 to $380,000 in fiscal year 2020. In dismissing Michael's motion to modify maintenance, the trial court found his request "a little bit preemptive and anticipatory" and reasoned, "I don't see a substantial change at this point." We agree. Indeed, these were the same arguments that Michael raised in his motion to reconsider the dissolution judgment. As discussed, the dissolution judgment demonstrates the trial court's explicit consideration of Michael's testimony regarding the anticipated reduction in his income and loss of capital points. Accordingly, considering the allegations in the light most favorable to Michael, he failed to state a cause of action for modification based upon a substantial change in circumstances. The trial court, therefore, properly dismissed his motion to modify maintenance pursuant to section 2-615.

¶ 68                    C. Valuation and Allocation of Partnership Interest

¶ 69   The trial court "shall divide the marital property *** in just proportions considering all relevant factors." 750 ILCS 5/503(d) (West Supp. 2019). Thus, in apportioning marital assets, the trial court must initially establish the value of the property. *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736 (2002). While the trial court's ultimate distribution of marital property is reviewed under the abuse-of-discretion standard of review (see *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 34), the trial court's determination as to the value of marital assets is reviewed under the manifest-weight-of-the-evidence standard of review (see *In re Marriage of Vancura*,

356 Ill. App. 3d 200, 203 (2005)). Here, the trial court's valuation of Michael's partnership interest was based upon the parties' stipulation as to Michael's capital account. Illinois courts look favorably upon stipulations that simplify issues and promote disposition of cases. *In re Marriage of Evanoff*, 2016 IL App (1st) 150017, ¶ 28. Stipulations will be enforced unless there is a showing that the stipulation is unreasonable, violative of public policy, or the result of fraud. *Id.*; see also *In re Marriage of Dunlop*, 294 Ill. App. 3d 768, 776-77 (1998) (when the parties to a dissolution proceeding stipulate to the value and division of marital property, that agreement is binding upon the court unless found to be unconscionable under the Act). A trial court's decision to accept the parties' stipulation will not be reversed unless it is an abuse of discretion. *In re Marriage of Tantiwongse*, 371 Ill. App. 3d 1161, 1163 (2007).

¶ 70    Michael, however, does not challenge the enforceability of the stipulation. Rather, he likens the stipulation to a contract and contends that the trial court erred as a matter of law in construing its plain language. Thus, he contends, the appropriate standard of review is *de novo*. See *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007) (the construction of a contract presents a question of law subject to *de novo* review). "A stipulation, although lacking some of the formal requisites of a contract, is an agreement between the parties." *People v. One 1999 Lexus, VIN JT8BH68X2X0018305*, 367 Ill. App. 3d 687, 692 (2006). Therefore, like a contract, a stipulation must be interpreted according to the parties' intent. *Id.* The plain and ordinary meaning of the contract language is the best indication of the parties' intent. *Gallagher*, 226 Ill. 2d at 233. A contract must be construed as a whole, viewing each part in light of the others, as words derive their meaning from the context in which they are used. *Id.*

¶ 71    Michael contends that the entirety of the stipulation reflects the parties' intent to agree that his partnership interest had no present value. He argues that paragraph two of the stipulation

consists of five interrelated sentences that must be construed as a whole. We turn to those five sentences. The first sentence sets forth the parties' agreement that "the value of Michael's partnership interest with Winston & Strawn, to the extent it has a value at present, is limited to at most the balance in his capital account." The second sentence incorporates as an exhibit a provision of Michael's partnership agreement governing the capital of the partnership and reflects the parties' agreement that Michael's entitlement to a reimbursement of his "then present capital account balance, if any" upon his death, disability, or withdrawal from the firm is "subject to the remaining terms of the Partnership Agreement." The third sentence sets forth the parties' agreement that "[a]t present Michael is not eligible to receive a payout from this capital account and the value of it in the future, if, as and when it is disbursed, has not yet been determined." The fourth sentences states: "Both parties also stipulate that the present value of Michael's the [*sic*] capital account held at Winston & Strawn is in the amount of $600,000." The final sentence incorporates as an exhibit an internal firm email confirming that the balance of Michael's capital account is $600,000.

¶ 72   There is simply no language reflecting an intent to stipulate that the partnership had no present value, as Michael contends. Instead, the language of the stipulation reflects an intent to agree to cap the value of the capital account at its present balance of $600,000. This is exactly what the first sentence states—any value "is limited to at most the balance in his capital account." The qualifying "if any" language in the second sentence refers to the balance of the capital account at the time of death, disability, or withdrawal from the firm. The paragraph concludes in no uncertain terms with the stipulation that "the present value" of Michael's capital account is $600,000, reflecting the $25,000 he paid into the capital account over time for each of his 24 variable points. Thus, the entirety of the stipulation reflects the parties' intent to agree that the

maximum value of Michael's partnership interest is limited to its present balance of $600,000 in his capital account. Accordingly, the trial court properly interpreted the stipulation in valuing the capital account at $600,000.

¶ 73    In contradiction to his argument that we should rely upon the plain language of the stipulation, Michael nevertheless argues that his unrefuted testimony established that his partnership interest has no present value and that any future value is a mere expectancy. Thus, Michael contends, his partnership interest was not property subject to allocation.

¶ 74    In support, Michael cites *In re Marriage of Centioli*, 335 Ill. App. 3d 650 (2002), and *In re Marriage of Eddy*, 210 Ill. App. 3d 450 (1991). These cases are inapposite. The issue in *Centioli* was whether a spouse may be enjoined from removing the other spouse as the beneficiary of an *inter vivos* revocable trust during the pendency of a dissolution of marriage proceeding. 335 Ill. App. 3d at 652. The court held that the injunction was not warranted because the beneficial interest in the trust was not a clearly ascertainable right. *Id.* at 656. Rather, the interest was "but a mere expectancy." *Id.* To be "property" under the Act, the *res* must be " 'in the nature of a present property interest, rather than a mere expectancy interest.' " *Id.* (quoting *In re Marriage of Weinstein*, 128 Ill. App. 3d 234, 244 (1984)). The issue in *Eddy* was the propriety of considering a spouse's eligibility to receive a portion of a trust as a current asset. 210 Ill. App. 3d at 459-461. In holding that the trial court erred in apportioning the eligible interest, the court reasoned that "[p]otential inheritances, just as expected degrees or licenses, are not property which can be valued or awarded to a spouse, although they can be given some consideration in determining property distribution." *Id.* at 460.

¶ 75    The value of Michael's capital account does not amount to a mere expectancy interest as does a potential inheritance or the beneficial interest in an *inter vivos* revocable trust. To the

contrary, the parties stipulated to the value of the capital account. Moreover, the trial court's valuation of the capital account was supported by the record. The valuation of the capital account at $600,000 was a straightforward calculation of the $25,000 Michael had paid into his capital account during the marriage for each of his 24 variable points.

¶ 76 Alternatively, Michael contends that the capital account should be treated like an unvested retirement asset pursuant to the formula set forth in *In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979). In *Hunt*, the court set forth the "reserved-jurisdiction approach" to dividing unmatured pension interests, pursuant to which the employee spouse pays the nonemployee spouse a *pro rata* share "if, as, and when the pension plan becomes mature." *Id.* at 663. The approach is appropriate when it is simply too difficult to assign a present value to the marital interest in the pension. See *In re Marriage of Richardson*, 381 Ill. App. 3d 47, 54 (2008). Here, however, it was not difficult for the trial court to assign a present value to the capital account. The parties' stipulation provided: "Both parties also stipulate that the present value of Michael's the [*sic*] capital account held at Winston & Strawn is in the amount of $600,000." Accordingly, the trial court's valuation of the capital account at $600,000 was not against the manifest weight of the evidence, and its division between the parties was not an abuse of discretion. The trial court also properly denied Michael's motion for reconsideration on this issue, as it raised essentially the same argument.

¶ 77 D. Valuation and Allocation of Savings Account

¶ 78 Just as the trial court's determination as to the value of marital assets is reviewed under the manifest-weight-of-the-evidence standard of review (see *Vancura*, 356 Ill. App. 3d 200 at 203), the trial court's characterization of assets as marital or nonmarital will be reversed only it if is against the manifest weight of the evidence (see *In re Marriage of McBride*, 2013 IL App (1st)

112255, ¶ 24). As discussed, the trial court's ultimate distribution of marital property is reviewed under the abuse-of-discretion standard of review (see *Hamilton*, 2019 IL App (5th) 170295, ¶ 34).

¶ 79    Initially, Michael contends that the trial court's characterization of the savings account titled in his name as marital property was against the manifest weight of the evidence because it was inconsistent with the trial court's characterization of three other accounts as nonmarital property. We will refer to the savings account at issue (titled in Michael's name with a balance of $558,158.68 as of October 31, 2018) as "account number one." The three other accounts were: "account number two" (titled in Michael's name with a balance of $67,688.55 as of October 31, 2018); "account number three" (titled in Michael's name with a balance of $223,446.83 as of October 31, 2018); and "account number four" (titled in Cristie's name with a balance of $52,936.25 as of October 17, 2018).

¶ 80    In his written closing argument, Michael asserted that account numbers one and two were his nonmarital property because "the income allocated to him pursuant to the December 1, 2017[,] [o]rder [for temporary support and maintenance] is partly deposited into said account[s]." He asserted that account number three was his nonmarital property because "it possesses the funds received from the $250,000 pre-distribution granted by this [c]ourt on May 10, 2018." (Recall that the May 10, 2018, order granted Cristie's petition for temporary allocation of expenses and awarded Cristie and Michael each $250,000 as an advance on their interest in the marital estate). In Cristie's written closing argument, she asserted that account number four was her nonmarital property because it included her temporary maintenance payments and her $250,000 pre-distribution from the May 10, 2018, order.

¶ 81    The trial court found all of the accounts to be nonmarital except Michael's account number one. As noted, the trial court found account number one to be marital property and valued it at

$558,158.68—the balance set forth in the October 31, 2018, account statement. The trial court therefore allocated $279,079.34 to Michael and $279,079.34 to Cristie.

¶ 82   Michael contends that account number one should have been characterized as nonmarital property because "no evidence supported the [c]ourt's inconsistent treatment of these four accounts, where the identical arguments were made as to each claim they were nonmarital." However, the arguments were not identical. With respect to accounts that held sums from the parties' respective advances on the marital estate pursuant to the May 10, 2018, order, the parties asserted that those accounts were nonmarital.

¶ 83   In contrast, with respect to account number one, Michael asserted that it was nonmarital because "the income allocated to him pursuant to the December 1, 2017[,] [o]rder [for temporary support and maintenance] is partly deposited into said account." In the December 1, 2017, agreed order, the trial court ordered that, beginning January 1, 2018, Michael pay Cristie monthly temporary maintenance in the amount of $11,593 and monthly temporary child support in the amount of $1,301. But the order contains no provision that Michael's subsequently earned income should be considered nonmarital property. Michael simply provides no compelling argument upon which to challenge the trial court's characterization of account number one as marital property. Accordingly, we cannot say that the trial court's characterization of account number one as marital property was against the manifest weight of the evidence.

¶ 84   Michael also challenges the date of the trial court's valuation of account number one. He contends that the trial court should have valued the account at $208,158.68 pursuant to its balance as of November 7, 2018, not at $558,158.68 pursuant to its balance as of October 31, 2018. We disagree.

¶ 85    In Michael's proposed allocation of assets submitted as an exhibit to his written closing argument, he cited exhibit 40 with respect to the allocation of account number one and noted the value of the account as $558,158.68. Exhibit 40 was the October 31, 2018, statement for account number one, reflecting a balance of $558,158.68. In his motion for reconsideration, he pointed out that he had also submitted as an exhibit at trial a November 7, 2018, account statement for account number one, reflecting a balance of $208,158.68. His position was that the funds were withdrawn to pay unallocated tax liability for 2018. However, in addition to the lack of sufficient evidence at trial to substantiate the use of the funds, Michael acquiesced in the trial court's reliance upon the October 31, 2018, balance by relying upon the exhibit in his written closing argument. He is thus precluded from now raising the argument that the trial court should have relied upon the November 7, 2018, balance. See *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33 (a party may not request to proceed in one manner and then contend on appeal that the requested action was error).

¶ 86    Accordingly, the trial court's characterization of account number one as marital property and its valuation of the account at $558,158.68 were not against the manifest weight of the evidence, and its division between the parties was not an abuse of discretion. The trial court, in turn, properly denied Michael's motion for reconsideration on this issue.

¶ 87                                III. CONCLUSION

¶ 88    For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 89    Affirmed.